### STATE

v.

### Mario MONTEIRO.

### No. 2006–118–C.A.

Supreme Court of Rhode Island.

June 22, 2007.

Boyz (Boyz) and the Oriental Rascals (Rascals). The battle was conducted on bicycles, with handguns; there were no winners. The events of July 2 and July 3, 2001, culminated in the senseless and unlawful killing of an innocent bystander. The defendant, Mario Monteiro (defendant or Monteiro), who was a juvenile at the time of the murder, stands convicted of first-degree murder, conspiracy to commit murder, using a firearm while committing a crime of violence resulting in death, numerous counts of assault with a dangerous weapon and various weapons charges.[1] He was sentenced to two consecutive terms of life imprisonment.

On appeal to this Court, Monteiro argues that the trial justice erred when he refused to suppress statements Monteiro made to the police, and in allowing the prosecutor to make prejudicial remarks during her opening statement. The defendant also contends that dual convictions for first-degree murder and using a firearm while committing a crime of violence resulting in death violate the Double Jeopardy Clauses of the state[2] and federal[3] constitutions, as well as the separation of powers required by Article V of the Rhode Island Constitution,[4] and further, that said convictions amount to cruel and unusual punishment. For the reasons stated herein, we affirm the convictions.

Virginia M. McGinn, Esq., Providence, for Petitioner.

Catherine Gibran, Esq., Providence, for Respondent.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case concerns the tragic aftermath of a daylong fight between rival Providence street gangs: the Providence Street

---

1. It is apparent that this case was overcharged by the grand jury. The defendant initially was named in a twenty-eight-count indictment; however, several charges were dismissed by the state and by the trial justice, judgment of acquittal was entered on several counts, and Monteiro was acquitted by the jury of three counts, resulting in conviction of the other nine counts.

2. Article 1, section 7, of the Rhode Island Constitution states in pertinent part: "No person shall be subject for the same offense to be twice put in jeopardy."

3. The Fifth Amendment to the United States Constitution states in pertinent part: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb * * *."

4. Article V of the Rhode Island Constitution states: "The powers of the government shall be distributed into three separate and distinct departments: the legislative, executive and judicial."

## Facts and Travel

This tragic saga began on July 2, 2001, when Monteiro, a seventeen-year-old member of the Boyz, along with his comrades, stole a bicycle belonging to Rocky Sok (Sok), who was associated with the Rascals.[5] Forced to walk home, Sok, who testified at trial, said that he encountered Monteiro and some Boyz and they attacked and beat him. This was but the opening skirmish; Sok escaped, only to see defendant again in Rascal territory, near "OR [Oriental Rascal] Park."[6] According to Sok, Monteiro displayed a handgun and warned Sok that "[a] rat is going to die."[7] Sok testified that as Monteiro took out the weapon, he dropped the clip, affording Sok an opportunity to flee. Sok ran to the Asa Messer School on Messer Street, where he met some Rascals. Sok next saw defendant on an adjacent street, sitting on his bicycle. The defendant fired his weapon at Sok, who, along with several Rascals, ran away.

According to Sok, later that evening he and a dozen or so Rascals, including Sakhoeuth Luong (Luong), were on Sorrento Street, in Rascal territory, lying in wait for defendant and his Boyz. When Monteiro and his friends arrived, the Rascals emerged from hiding, one Rascal had a gun and they all chased defendant and his compatriots out of Rascal territory. As he fled, defendant turned around and fired his weapon at the Rascals for the second time.

Later that night, the Rascals were back on Althea Street at the Asa Messer School Annex near Oriental Rascal Park, when they encountered defendant for the last time. According to Luong, a trial witness, defendant appeared and fired "about three or four shots toward the crowd." Luong testified that as defendant fired his weapon, he (Luong) heard the reverberation of the shots against the walls of the school and the utility poles in the area. One of those shots struck and killed thirty-one-year-old Rom Peov (Peov), an innocent bystander who happened to be visiting nearby at 198 Hanover Street.

Providence police Detective Thomas Rawnsley (Det. Rawnsley), a member of the department's Youth Services Bureau responsible for investigating juvenile crime, was called in at 3:30 a.m. on July 3, 2001, in connection with the murder of Peov. Detective Rawnsley testified that Monteiro and another Boyz member, Fidel DelPino (DelPino), were suspects in the murder, as well as other gang-related shooting incidents.

The defendant fled and was not apprehended until October 11, 2001. Detective Rawnsley testified that during the intervening months, he developed a relationship with defendant's guardian, Pauline Palmer (Palmer).[8] On the morning of October 11, 2001, Palmer notified Det. Rawnsley that defendant had returned home and was asleep in his bedroom. Armed with an arrest warrant, Providence detectives arrived at Palmer's home, were led into Monteiro's bedroom, and arrested defendant, who was in bed.

---

5. Although Sok admitted an association with the Rascals, he denied that he was a member of the gang.

6. According to the testimony, "OR [Oriental Rascal] Park" is on Sorrento Street behind the fire station, near the Asa Messer School Annex, and is an area where the Rascals congregate to "chill" or "hang out."

7. The record discloses that the term "rat" is a disrespectful reference to a Rascal.

8. Ms. Palmer has been referred to by defendant and counsel for both sides as defendant's mother, as well as his guardian. The trial justice referred to her as defendant's "legal guardian." We shall refer to her as defendant's guardian.

During the arrest and ensuing questioning, defendant was at all times accompanied by his guardian. He was processed at the police station and advised of his rights, both orally and in writing. The record discloses that defendant was allowed to use the restroom, have lunch, smoke cigarettes, and—perhaps most importantly—consult with Palmer in private several times during his interrogation. Although he attempted to place the blame for the firing of the fatal shot on DelPino, defendant did implicate himself in the day-long gang violence.

The defendant admitted that he was at the scene of the murder and that he had fired the weapon during the earlier encounters with Sok. With respect to the time of the murder, however, he placed the gun in DelPino's hand. The defendant told police that after he and DelPino learned that the Rascals were on Hanover Street, they obtained a ride to the area in a van. According to Monteiro, he and DelPino were hiding across the street when DelPino fired several shots and then tossed the gun to defendant. The pair fled in the van. The defendant admitted that upon returning to the van, he shouted "we shot 'em, we shot 'em" and that he thought that someone was dead. After disposing of the weapon, they drove back toward Hanover Street and were disappointed to see only one police vehicle at the scene.[9]

Because Monteiro was seventeen years old at the time of the crimes, he was initially before the Family Court, but that court entered an order waiving its jurisdiction over defendant. A grand jury subsequently returned a twenty-eight-count indictment against him. The jury convicted

defendant of nine counts in the indictment. After the trial justice denied defendant's motion for a new trial, he was sentenced to two mandatory consecutive sentences of life imprisonment for first-degree murder and for using a firearm resulting in death. He was also sentenced to concurrent sentences of ten years to serve for conspiracy to commit murder, carrying a pistol without a license, and three counts of felony assault, as well as ten years suspended, with ten years of probation, for using a firearm while committing a felony. Monteiro filed a timely notice of appeal. We affirm.

## Argument

### Waiver of *Miranda* Rights

The defendant contends that his statements to police should have been suppressed by the trial justice because, he argues, he did not voluntarily waive his right to remain silent and his right to counsel, also known as his *Miranda*[10] rights. Although defendant acknowledges that he was advised of his constitutional rights and understood them, he argues that the incriminating statements nevertheless were involuntary because he was a teenager with a tenth-grade education and had no prior police contacts. He contends that the police "dragged [him] out of bed," told him that "he would be better off if he cooperated," and transformed his guardian into a "*de facto* agent" of the police. Because of his youth and lack of criminal experience, defendant argues, this Court, in examining the totality of the circumstances surrounding the waiver of his rights, should examine the voluntariness of

---

9. DelPino was named as a codefendant in five counts of the indictment. He entered a plea of guilty to: conspiracy, possession of a firearm without a license, and using a firearm while committing a crime of violence. He received a ten-year sentence, with five years

to serve and the balance suspended, and he did not testify at Monteiro's trial.

10. *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

his statements "cautiously and critically" to satisfy ourselves that his confession was not only voluntary, but, additionally, did not result from the adolescent's ignorance of his rights or from his fear of the police. Thus, defendant urges this Court to conclude that the trial justice should have suppressed his statements to the police. We disagree with these contentions.

■ When examining a trial justice's finding that a confession was knowing and voluntary, this Court uses a totality of the circumstances standard that applies to juveniles as well as adults. *State v. Kryla*, 742 A.2d 1178, 1184 (R.I.1999); *see also In re Kean*, 520 A.2d 1271, 1276 (R.I.1987) (declaring that the voluntariness of a juvenile's confession is measured by the standard applicable to adult defendants). Such an approach requires inquiry into the entirety of the circumstances that led to the waiver; the Court looks at "the juvenile's age, experience, education, and intelligence, his or her capacity to understand the *Miranda* warnings and the consequences of [a] waiver [of those rights], and the presence of a parent, a guardian, or an interested adult." *Kryla*, 742 A.2d at 1184 (quoting *State v. Campbell*, 691 A.2d 564, 567 (R.I.1997)).

■ Both the United States and the Rhode Island Constitutions forbid the use of a defendant's involuntary confession. *State v. Humphrey*, 715 A.2d 1265, 1274 (R.I.1998). In accordance with the crucially important holding in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before a confession can be used at trial, the state must establish, by clear and convincing evidence, that the defendant knowingly and intelligently waived his or her right against self-incrimination and that the statement was voluntary. *Humphrey*, 715 A.2d at 1274. A voluntary statement is a product of free will and rational choice, whereas a state-ment is deemed involuntary when the defendant's will was overcome by coercion, threats, violence, or undue influence. *Id.*

■ This Court applies a two-step review of a trial justice's determination that a confession was voluntary. *Humphrey*, 715 A.2d at 1273. First, we review the trial justice's findings of historical fact with deference, and we will not overturn those findings unless they are clearly erroneous. *Kryla*, 742 A.2d at 1183. Second, because this issue is of constitutional dimension, we accept the historical facts and credibility determinations, and we then conduct *de novo* review of the trial justice's conclusion that the confession was voluntary. *Id.*

After examining the record in this case, we are satisfied that defendant's statements were voluntary and that the trial justice did not err when he refused to suppress them. The evidence presented at the suppression hearing discloses that Det. Rawnsley advised defendant of his rights both orally and in writing. The defendant read and signed the waiver of rights form that set forth the fact that he was a suspect in the crime of murder. Significantly, Palmer was present during the interview and was allowed to converse with Monteiro privately at several points during the interrogation. Detective Rawnsley testified that defendant did not appear to be under the influence of alcohol or drugs, nor did he indicate an unwillingness to make a statement. Finally, Det. Rawnsley testified that no one made any promises to defendant or otherwise coerced him into waiving his rights.

On cross-examination, Det. Rawnsley acknowledged telling Palmer that it would be in defendant's best interest for him to speak to the police because they needed to discover the truth, but he denied having made any suggestion that it would go easi-

er on defendant if he gave a statement to the police. This fact is of no moment to this appeal. *Cf. Kryla*, 742 A.2d at 1184 (a juvenile defendant's mistaken belief that he would remain in the juvenile system if he cooperated based on a purported promise to his mother does not necessarily render his confession involuntary). Moreover, this Court has recognized that "[l]aw enforcement agents are also permitted to tell an accused that his cooperation would be 'helpful' to him[.]" *State v. Marini*, 638 A.2d 507, 513 (R.I.1994). Therefore, after examining this testimony, we are of the opinion that the statement was voluntary and not induced by any promises or rewards.

Monteiro also testified at the suppression hearing and recounted a different series of events. Although he admitted signing the rights form and statements, he insisted he did so because the police promised that "if I was to give them a statement that it will be in my best interest; I won't get lots of time in jail." According to defendant, he was not going to say anything until he was promised that he would not "get lots of time." The defendant admitted knowing that he had a right to counsel, but acknowledged that he opted to proceed without a lawyer.

The trial justice denied defendant's motion to suppress, and set forth his reasons in a comprehensive decision. He reviewed the testimony and found no indication that the police threatened or coerced defendant. Although defendant was only seventeen years old, the trial justice found that his guardian was with him when he was advised of his rights and during the interrogation. The trial justice rejected defendant's argument that the police promised him a light sentence in exchange for his confession and accepted as credible the testimony of Det. Rawnsley, who specifically and explicitly denied making such a promise. The trial justice concluded that defendant's statements to the police were the product of his free will and were made without any coercion, threats, or promises on the part of the police.

In viewing this record in light of the totality of the circumstances, we note that defendant was accompanied by his guardian, who did not testify. Further, rather than acknowledge his guilt in this tragic killing, defendant attempted to exculpate himself from the murder by pointing the finger at DelPino, one of his fellow Boyz. Although he freely implicated himself in the earlier, less serious crimes, defendant placed the firearm in DelPino's hands at the time of the final and fatal attack. *See State v. Pacheco*, 481 A.2d 1009, 1016 (R.I. 1984) (defendant's statement to police in which he attempted to exculpate himself from the crime was a factor to consider in evaluating the totality of the circumstances surrounding the waiver of rights). Although at variance with the testimony of the state's witnesses, defendant's statement demonstrates that he was calculating and cunning and understood the gravity of his position when he implicated his fellow gang member in the murder. This fact weighs in favor of a finding of voluntariness.

Accordingly, after reviewing the trial justice's factual findings and credibility determinations with the requisite deference, we are satisfied that the trial justice did not err when he found by clear and convincing evidence that defendant's statements to the police were the product of a knowing and voluntary waiver of his constitutional rights and were not obtained by threats, promises, or other inducements.

### Opening Statement

■ The defendant next argues that the trial justice erred by allowing an alleged prejudicial comment to come before the

jury during the state's opening statement. During her opening statement, the prosecutor said: "Let me tell you a little bit about who Rom Peov was. A thirty one year-old man. He had a job. He had a family who cared about him." The defendant objected to these remarks and argues on appeal that the trial justice should have passed the case or given a timely cautionary instruction to the jury. He asked for neither. Before this Court, defendant argues that it would have been futile to move for a mistrial or request a cautionary instruction. We reject these contentions and deem this issue waived.

 To preserve an issue for appellate review, a defendant must object and move for a mistrial or request a cautionary instruction. *State v. Portes*, 840 A.2d 1131, 1141 (R.I.2004). However, if such a request would be futile, or any attempt to cure the prejudice would have been ineffective, an exception to this raise-or-waive rule applies. *State v. Horton*, 871 A.2d 959, 964 (R.I.2005).[11] The record is devoid of any suggestion that a request for a cautionary instruction or motion to pass the case would have been futile. In this case, we are not confronted with multiple rulings by the trial justice overruling similar objections by defendant. *See id.* at 965. As such, we are satisfied that defendant waived this issue and cannot invoke this exception to the raise-or-waive rule.

 Moreover, even if this issue was properly preserved, it is without merit because the prosecutor's statement was not improper or prejudicial so as to warrant a new trial. We have previously held that, although there is no precise formula by which the proper bounds of attorney comment is delineated, prejudice exists when the attorney's statement is extraneous to the issues before the jury and tend to inflame the passions of the jury. *See State v. Boillard*, 789 A.2d 881, 885 (R.I.2002); *State v. Mancini*, 108 R.I. 261, 273–74, 274 A.2d 742, 748 (1971). In this case, the prosecutor merely stated that the victim was thirty-one years old, was employed, and had a family who cared for him. This was a murder trial: someone died, and the manner of death was homicide. We fail to see how a brief glimpse into the humanity of a murder victim would so incite prejudice in the minds of the jury to warrant a mistrial. Nor are we persuaded that a precautionary instruction was in order. Before the state embarked on its opening statement, the trial justice instructed the jury that statements of counsel were not evidence and that the only evidence the jury was to consider was the testimony and exhibits that were introduced at trial. These instructions were repeated during the jury charge. Accordingly, we reject defendant's assignment of error.

## Constitutionality of Consecutive Life Sentences

The defendant also argues that his convictions for first-degree murder and using a firearm resulting in death, as set forth in G.L.1956 § 11–47–3.2(b)(3) and (c)[12] vio-

---

11. Another exception is available in limited circumstances when constitutional rights are affected, and a party can demonstrate that: the error was harmful, the record is sufficient to allow determination of the issue, and the failure to raise the issue at trial was due to a novel rule of law that the attorney could not have known about at the time of trial. *State v. Portes*, 840 A.2d 1131, 1141 (R.I.2004); *see also State v. Fortes*, 922 A.2d 143, 149 n. 4

(R.I.2007); *State v. Remy*, 910 A.2d 793, 800 (R.I.2006). The defendant does not contend that this exception applies in the present case.

12. General Laws 1956 § 11–47–3.2 states in pertinent part:
 "(a) No person shall use a firearm while committing or attempting to commit a crime of violence. * * * Any sentence imposed upon a person pursuant to this sec-

late the Double Jeopardy Clauses of both the state and federal constitutions and the separation of powers required by the Rhode Island Constitution; finally, he contends that the sentences are grossly excessive in violation of the Eighth Amendment[13] and the Rhode Island Constitution, article 1, section 8[14] prohibitions against cruel and unusual punishment. Some of these issues were not preserved; all are without merit.[15]

■ Notwithstanding the failure to preserve his double jeopardy and merger contentions, defendant asks us to reconsider our holdings in *State v. Feliciano*, 901 A.2d 631, 648 (R.I.2006) and *State v. Rodriguez*, 822 A.2d 894, 904–08 (R.I.2003), in which we concluded that convictions for both crimes do not merge for double jeopardy purposes. We decline defendant's request, and we reaffirm our holding in *Rodriguez* and its progeny.

■ The defendant also argued to the trial justice and to this Court on appeal that the Legislature's designation of a mandatory life sentence for violating § 11–47–3.2(b)(3) (using a firearm while committing a crime of violence resulting in

death), coupled with the mandate that the penalty "shall run consecutively, and not concurrently, to any other sentence imposed" as provided in § 11–47–3.2(c), violates Article V of the Rhode Island Constitution, which provides that "[t]he powers of the government shall be distributed into three separate and distinct departments: the legislative, executive and judicial." According to defendant, when the General Assembly prescribed a mandatory and consecutive sentence of life imprisonment for anyone who uses a firearm while committing murder, it usurped the judicial power by depriving the trial justice of his or her sentencing discretion. This argument is without merit.

■ This Court has long held that it is the prerogative of the General Assembly to define criminal offenses and set forth the sentences for those crimes and that when it does so, the Legislature is not intruding upon the judicial function. *Hazard v. Howard*, 110 R.I. 107, 111, 290 A.2d 603, 606 (1972). Although the Legislature may not encroach upon the judicial power by attempting to control or alter a judicial decision or a court's prior judgment, *Lemoine v. Martineau*, 115 R.I. 233, 238, 342

tion shall be imposed consecutively to and not concurrently with any sentence imposed for the underlying crime or attempted crime * * *.

"(b) Every person who, while committing an offense violating subsection (a) of this section, discharges a firearm shall be guilty of a felony and be imprisoned as follows: "* * *

"(3) Life, * * * if the death or permanent incapacity of any person (other than the person convicted) results from the discharge of the firearm.

"(c) The penalties defined in subsection (b) of this section shall run consecutively * * *."

13. The Eighth Amendment to the United States Constitution states in pertinent part: "nor [shall] cruel and unusual punishments [be] inflicted."

14. Article 1, section 8, of the Rhode Island Constitution states in pertinent part: "nor [shall] cruel punishments [be] inflicted; and all punishments ought to be proportioned to the offense."

15. The defendant alleges that after his conviction, but before sentencing, defense counsel moved to dismiss count 7 (using a firearm when committing a crime of violence resulting in death) on constitutional grounds, including *inter alia* double jeopardy; this motion was denied at the sentencing hearing. The defendant renewed this motion after sentencing. The posttrial motions to dismiss also raise equal protection and selective prosecution arguments—defendant has waived these arguments.

A.2d 616, 620 (1975); *State v. Garnetto*, 75 R.I. 86, 91–92, 63 A.2d 777, 779–80 (1949), the General Assembly is vested with the power to delineate criminal offenses and their punishments. Moreover, in recognizing the authority of the Legislature to determine the appropriate punishment for a given crime, this Court has refused "to substitute our will for that of a body democratically elected by the citizens of this state and to overplay our proper role in the theater of Rhode Island government." *Feliciano*, 901 A.2d at 648 (quoting *DeSantis v. Prelle*, 891 A.2d 873, 881 (R.I. 2006)). Nor are we persuaded that the mandate of consecutive sentences for murder and using a firearm while committing that murder requires a different result. It is the Legislature's prerogative to authorize cumulative punishments; when it does so, it is the judicial task to impose that sentence in due course. *See Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983) ("Legislatures, not courts, prescribe the scope of punishments."). Accordingly, we are satisfied that defendant's contentions are without merit.

■ Finally, we shall briefly address defendant's contention that the two mandatory and consecutive sentences of life imprisonment imposed in this case violate the Eighth Amendment prohibition against cruel and unusual punishment, as well as article 1, section 8, of the Rhode Island Constitution, because, he argues, the punishments are grossly excessive.[16] " 'The burden of proving that a [criminal] sentence is manifestly excessive falls to the party seeking reduction.' " *McKinney v. State*, 843 A.2d 463, 473 (R.I.2004).

The defendant cites this Court's opinion in *State v. Ballard*, 699 A.2d 14, 19 (R.I. 1997), to support his claim that his sentence was grossly disproportionate; this reliance is misplaced. In *Ballard*, this Court ordered reduced two consecutive sentences of life imprisonment to concurrent life terms that would run concurrently with a sentence of sixty-five years. *Id.* Those sentences were not mandatory but were imposed in the exercise of the trial justice's sound discretion. *Id.* In this case, the consecutive life sentences imposed by the trial justice were mandatory. *See* § 11–47–3.2(c). Thus, to the extent that *Ballard* retains any value as precedent, *see State v. Vieira*, 883 A.2d 1146, 1150 n. 3 (R.I.2005) (reaffirming that our prior holding in *Ballard* should be narrowly read as applying to the facts of that case), it is of no assistance in evaluating the constitutionality of mandatory consecutive sentences.

■ This Court has recognized that the Eighth Amendment contains a narrow proportionality principle such that a criminal sentence is excessive and unconstitutional if, *inter alia*, it "is grossly out of proportion to the severity of the crime." *McKinney*, 843 A.2d at 467 (quoting *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)). In *McKinney*, 843 A.2d at 469, we adopted this narrow proportionality principle (that applies to both capital and noncapital sentences), as discussed by the United States Supreme Court in *Ewing v. California*, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) and *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144

---

**16.** In the usual case, we will not review a sentence on direct appeal, but rather require that the defendant first seek relief under Rule 35 of the Superior Court Rules of Criminal Procedure. *See* Super. R.Crim. P. 35 (entitled "correction, decrease or increase of sen-

tence"); *State v. Bettencourt*, 723 A.2d 1101, 1114 (R.I.1999). However, because of the mandatory nature of this sentence, Rule 35 is of little assistance in this case and we deem direct review appropriate in this limited context.

(2003). "The gross disproportionality principle reserves a constitutional violation for only the extraordinary case." *Lockyer*, 538 U.S. at 77, 123 S.Ct. 1166. "The overriding inquiry for determining 'proportionality' is whether the sentence is commensurate with the gravity of the crime." *McKinney*, 843 A.2d at 469 (citing *Ewing*, 538 U.S. at 23, 123 S.Ct. 1179 (Kennedy, J., concurring)). Thus, a constitutional violation will be found only in extreme circumstances in which the sentence is grossly disproportionate to the offenses for which defendant stands convicted.

■ Turning to article 1, section 8, of the Rhode Island Constitution, in *State v. Ouimette*, 479 A.2d 702, 706 (R.I.1984), we acknowledged that our state constitution contains a provision requiring that "all punishments ought to be proportioned to the offense[.]" However, we recently have had occasion to revisit our holding in *Ouimette* and, in doing so, have recognized that the Supreme Court's Eighth Amendment jurisprudence has changed significantly since John Ouimette's life sentence for robbery was reduced to forty-five years, with thirty years to serve and fifteen years suspended. *McKinney*, 843 A.2d at 470; *see also Ouimette*, 479 A.2d at 703, 706. "The proportionality principle of the Eighth Amendment requires a comparison of the defendant's sentence to similarly situated defendants if the Court has [first] determined that the defendant's sentence is grossly disproportionate to the crime itself." *McKinney*, 843 A.2d at 470. Accordingly, we reaffirmed our holding that the Eighth Amendment's prohibition against cruel and unusual punishment and the provisions of article 1, section 8, of the Rhode Island Constitution are identical. *Id.* A criminal sentence is disproportion-

ate "if the sentence itself is unduly harsh when compared with the crime." *Id.*

In the present case, we are confronted with a mandatory sentence—this is a case of first-degree murder in which an innocent bystander was killed as a result of gun violence by a member of a street gang. In addition to a mandatory sentence of life imprisonment for first-degree murder,[17] a mandatory consecutive life term was imposed because defendant committed the murder with a firearm. The record portrays a daylong gun battle on the streets and playgrounds of the city of Providence. After defendant declared his intention to kill a member of a rival gang, he fired his weapon on three separate occasions, culminating in the death of an innocent party. After reviewing this record, we are satisfied that this crime is precisely the type of gun violence that the Legislature intended to address when it provided for a mandatory consecutive sentence of life imprisonment for using a firearm while committing murder.

We are not persuaded that this sentence is unconstitutional. Although this conviction constitutes defendant's introduction into the adult criminal justice system, this factor is outweighed by the nature of the crime and the state's public safety interest in preventing gang murders and indiscriminate shootings on the streets of our cities and towns. We are mindful that this is not the harshest punishment under our law. A sentence of life imprisonment without the possibility of parole is reserved for the most heinous murders, when special circumstances are found by the jury, including, *inter alia*, felony murder, murder for hire, murder involving torture or aggravated battery, or the murder of a police officer. General Laws 1956 § 11–23–2. A consecutive life sentence for a

---

17. General Laws 1956 § 11–23–2, entitled "Penalties for murder" states in pertinent part: "Every person guilty of murder in the first degree shall be imprisoned for life."

gang-related murder of an innocent by-stander committed with a firearm does not constitute an extraordinary case warranting an application of the proportionality principle. *McKinney*, 843 A.2d at 470. Thus, we reject defendant's contention that this sentence constitutes cruel and unusual punishment.

### Conclusion

For the reasons stated in this opinion, we hereby affirm the judgment of conviction. The papers in this case are remanded to the Superior Court.