**Supreme Court**

No. 2013-110-C.A.
(P2/11-779A)

State                    :

v.                    :

Joseph Armour.                    :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State            :

v.            :

Joseph Armour.       :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**  This case came before the Supreme Court on February 3, 2015, on appeal by the defendant, Joseph Armour (defendant), from a Superior Court judgment of conviction following a jury verdict of guilty of one count of second-degree child molestation.  The defendant contends that the trial justice erred in: (1) denying his motion to suppress an incriminating confession he gave to the police; (2) permitting Dr. Amy Goldberg (Dr. Goldberg) to testify regarding the explanation of a normal examination over defense counsel's objection; and (3) denying the defendant's motion for judgment of acquittal.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**Facts and Travel**

In 2010, six-year-old Sarah[1] lived with her mother and defendant in a multifamily home in East Providence, Rhode Island.  The defendant had been renting a bedroom on the second

---

[1] In order to protect the child's privacy, she has been given a pseudonym.

floor, while the child and her mother lived on the first floor.[2]  On January 29, 2011, at approximately one o'clock in the morning, Sarah awakened to defendant touching her vagina. After Sarah's mother saw defendant run out of Sarah's room, she went into her daughter's room, turned on the light, and noticed that the blankets covered her daughter's head.  When Sarah's mother moved the blankets, she saw that her daughter's jeans and underwear had been pulled down below her waist.  Sarah's mother immediately took the child into her own bedroom, locked the door, and asked her "Did he touch your cookie?"[3]  Sarah answered "yes[,]" and her mother subsequently called the East Providence police. When the police arrived, Sarah's mother explained what had happened, and Sarah was taken to Hasbro Children's Hospital (Hasbro) for an examination, which was performed by Dr. Goldberg.  The following day the police arrested defendant.

On March 18, 2011, a criminal information was filed against defendant in Providence County Superior Court, alleging one count of second-degree child molestation in violation of G.L. 1956 § 11-37-8.3 and § 11-37-8.4.  A jury trial was held in September 2012.  The jury returned a verdict of guilty, and the trial justice sentenced defendant to thirty years at the Adult Correctional Institutions, with ninety months to serve and two hundred and seventy months suspended with probation.  The defendant timely appealed.

**Motion to Suppress**

On appeal, defendant argues that the trial justice erred when she denied defendant's motion to suppress an incriminating statement he gave to the East Providence police while in custody.  It was defendant's contention that the confession was obtained in violation of his

---

[2] The child's mother had known defendant for over twenty years and had "thought of him as family."

[3] Sarah and her mother testified that "cookie" is the word they used to refer to the child's vagina.

constitutional rights against self-incrimination and his right to counsel. A pretrial hearing on the motion was held, which featured the testimony of two East Providence police officers, defendant, defendant's mother, defendant's cousin, and an attorney who had been contacted by defendant's cousin.

Detective Mark Jones (Det. Jones) of the East Providence police department was the first witness. Detective Jones was on duty on January 29, 2011 and spoke with defendant the following day, after defendant's arrest. According to Det. Jones, he and another officer, Det. Michael Spremulli (Det. Spremulli), first spoke to defendant while in the department cellblock and, after he agreed to speak with them, defendant was moved to an interview room. Detective Jones stated that he "asked [defendant] if he understood, if he could read English, if he could read period, and [defendant] said yes." Detective Jones testified that he provided defendant with a rights form and advised defendant of his constitutional rights, as set forth on the form. The defendant then initialed each numerically listed item on the rights form and signed the form.

Next, Det. Jones testified that, although defendant was alert, he appeared "subdued but nervous[,]" which the detective characterized as normal behavior. Detective Jones acknowledged that defendant stated that he had vomited some sleeping pills which he ingested prior to being arrested while purportedly attempting suicide, but the officer testified that he did not observe anything that would suggest defendant had taken sleeping pills. Detective Jones testified that defendant stated the following:

> "He said that night of the incident, he was in Cranston * * * doing shots. He got home, he thinks it was around midnight or so, took a sleeping pill, and then he said he went into [Sarah's] bedroom to check on her. And he said he saw that she had a pair of jeans, she seemed uncomfortable. So he decided to pull her pants down, and while doing so her underwear came down as well. Then he said when he saw her vagina he got curious as to what it would feel like. So at that time, he said he touched her vagina, got nervous,

realizing what he did was wrong, and then left the room."

After the interview, Det. Jones typed the statement, asked defendant to read the statement, and then asked him if there were any inconsistencies in the statement or anything he wished to change. Detective Jones testified that defendant never indicated that the statement was incorrect or that it was incomplete in any way. The defendant then signed the statement. Detective Jones noted that at no time during his interaction with defendant did defendant ever ask to speak to an attorney, nor did defendant request that he be allowed to make a phone call.[4]

Detective Spremulli also testified at the suppression hearing. Detective Spremulli's testimony corroborated the testimony of Det. Jones. Specifically, Det. Spremulli testified that he was present when defendant read the rights form, indicated to the officers that he understood the contents of the form, and initialed and signed the rights form. Detective Spremulli's recollection of defendant's confession was substantially the same as that of Det. Jones. Detective Spremulli also testified that he did not recall defendant asking for a lawyer, nor did he recall anyone coming into the interview room to tell the officers about a telephone call.

The defendant's version was at variance with the testimony of the police detectives. According to defendant, after he was first arrested and while still in handcuffs, ten to fifteen officers "kept saying[,] * * * did you resist arrest? Did he resist arrest? * * * I hope he does, I hope he does, I'm really in the mood to mess him up. They kept saying, I want to mess him up, I want to fuck him up." He testified that the officers were "fingering their Billy clubs and putting their hands on their guns and stuff * * *." The defendant stated that he "was afraid they were going to beat the hell out of [him]" and that he felt "intimidated." The defendant testified that, when he arrived at the station, officers further threatened him about what he could expect from

---

[4] Detective Jones did, however, testify that the booking sheet was marked "phone call, no[,]" indicating, according to the officer, that defendant "didn't choose to make a phone call."

the other inmates at the prison, which made him think that he "was going to die." The defendant stated that, while at the police station, he asked an officer if he could make a phone call; however, because the telephone number of the person he wished to call was on his mobile phone, the officer allowed defendant to make one phone call from his mobile phone. The defendant testified that he called his mother and asked her to call his cousin and ask the cousin to obtain a lawyer for him.

The defendant's testimony concerning the interview with Det. Jones and Det. Spremulli also differed from that of the detectives. He testified that, numerous times before he was shown the rights form, he asked for a lawyer. He testified that Det. Jones ignored his requests and kept pestering him about the incident. The defendant testified that he signed the rights form because he was scared, tired, and "afraid that the judge was going to decide [he] was guilty if [he] didn't give [his] side of the story." He also told the court that, while being questioned, another officer came into the room where he was being questioned and said something to Det. Jones about a phone call. The defendant admitted to giving a statement to the police and signing it, but he stated that he never read it and only signed it because he "was afraid not to." However, on cross-examination, defendant admitted that he understood he did not have to say anything to the officers but spoke with Det. Jones anyway.

The defendant's mother also testified at the suppression hearing. She testified that, on January 30, 2011, she received a call from defendant, requesting that she obtain a lawyer for him. She testified that she told defendant that she would contact his cousin to obtain a lawyer for him; she then called defendant's cousin, who agreed to help. The defendant's cousin also testified and stated that she contacted Attorney Priscilla DiMaio (Attorney DiMaio), who agreed to represent defendant.

- 5 -

Lastly, Attorney DiMaio testified. Attorney DiMaio testified that, on January 30, 2011, at approximately 9:45 in the morning, she called the East Providence police department, identified herself as an attorney who was trying to contact defendant, and asked to speak to a detective. She stated that she also asked to speak with defendant, but her request was denied. She testified that she told a detective "to let [defendant] know that [she had] called, and * * * not to give a statement." We note that the record discloses that defendant signed the waiver of rights form at 9:40 that morning.

At the conclusion of testimony and after hearing counsels' arguments, the trial justice rendered a bench decision. The trial justice denied the motion to suppress, declaring that, based on the record before her, defendant's statement was voluntary and that defendant had not been deprived of his right to counsel. With respect to whether the statement was voluntary, the trial justice found defendant's testimony "implausible," "unbelievable," and "far-fetched." "Viewing all the evidence and under the totality of the circumstances[,]" the trial justice found that defendant's statement was not coerced and that defendant knowingly, intelligently, and voluntarily waived his rights. Also, with respect to defendant's argument that he was deprived of his right to counsel, the trial justice, citing State v. Burbine, 451 A.2d 22 (R.I. 1982), noted "that the effort by third parties to retain counsel for the defendant is entirely irrelevant to whether the defendant asked for and was denied the right to counsel." See id. at 27-28. The trial justice went on to find "the detectives to be more credible than the defendant in testifying that the defendant never did request counsel." Specifically, the trial justice found "it incredible that such numerous requests [for a lawyer] were made * * * and fell on deaf ears * * *." The trial justice determined that the state had established by clear and convincing evidence that defendant did not request an attorney and, therefore, was not deprived of his right to counsel.

Before this Court, defendant asserts that the trial justice erred in denying his motion to suppress his statement to police, arguing that his statement was not voluntary. "Both the Rhode Island and the United States Constitutions bar the use of a defendant's involuntary statements in a criminal trial." State v. Bojang, 83 A.3d 526, 532 (R.I. 2014) (quoting State v. Bido, 941 A.2d 822, 835 (R.I. 2008)). "In order for the trial justice to admit a defendant's statement at trial, 'the state must establish, by clear and convincing evidence, that the defendant knowingly and intelligently waived his or her right against self-incrimination and that the statement was voluntary.'" Id. at 533 (quoting State v. Monteiro, 924 A.2d 784, 790 (R.I. 2007)). "This inquiry 'requires an analysis of the totality of the circumstances surrounding the interrogation.'" Id. (quoting State v. Jimenez, 33 A.3d 724, 734 (R.I. 2011)). "This Court applies the following two-step review of a trial justice's finding of voluntariness:

> 'First, we review the trial justice's findings of historical fact with deference, and we will not overturn those findings unless they are clearly erroneous. * * * Second, because this issue is of constitutional dimension, we accept the historical facts and credibility determinations, and we then conduct de novo review of the trial justice's conclusion that the confession was voluntary.'"
> Id. (quoting Monteiro, 924 A.2d at 790).

After examining the record in this case, we are satisfied that defendant's confession was voluntary and that the trial justice did not err when she refused to suppress the confession. The evidence presented at the suppression hearing disclosed that Det. Jones advised defendant of his rights, both orally and in writing. The defendant initialed and signed the waiver of rights form that was introduced into evidence. Detective Jones testified that defendant appeared alert, and both Det. Jones and Det. Spremulli testified that defendant acknowledged that he understood his rights. Finally, defendant himself testified that he knew he did not have to say anything to the detectives, but he nevertheless proceeded to speak with the detectives and then to sign the statement.

Although the trial justice set forth her decision in a comprehensive bench ruling, she did err when she stated that "defendant never testified that his mother, aunt, and/or cousin were in the process of retaining an attorney * * * [n]or did the defendant testify that he, in fact, had already made a call to his mother requesting that she procure an attorney for him." The record reveals that defendant did testify about the phone call to his mother. Nonetheless, this error was not material and has no impact on our decision given the appropriate factual findings and credibility determinations made by the trial justice in view of the totality of the circumstances.[5] The trial justice specifically found that defendant did not invoke his right to counsel. The trial justice rejected defendant's argument that the police officers threatened him or deprived him of his right to counsel. The trial justice concluded, after analyzing the totality of the circumstances, that defendant knowingly, intelligently, and voluntarily waived his rights and spoke to the police.

In light of the trial justice's findings of historical fact and credibility determinations, which we review with deference, we are satisfied that the trial justice did not misconceive or overlook material evidence, nor did she err in her conclusions. Our de novo review also satisfies us that defendant's confession was given voluntarily.

Finally, we pause to note that defendant also argued that the trial justice erred in denying his motion to suppress because he "was denied his right to a confidential phone call pursuant to R.I.G.L. § 12-7-20." General Laws 1956 § 12-7-20 provides that a person who is arrested "shall be afforded, as soon after being detained as practicable, * * * the opportunity to make use of a telephone for the purpose of securing an attorney * * *." Here, defendant testified that, after he

---

[5] The defendant testified that he was given an opportunity to make a phone call and did make a phone call. The detectives testified that the booking sheet was marked "phone call, no[,]" indicating that defendant "didn't choose to make a phone call." Whether or not the notation on the booking sheet meant that defendant did not make a phone call from a police phone is irrelevant to our analysis. It is not disputed that defendant did in fact make a telephone call to his mother.

was arrested and transported to the East Providence police station, he made a phone call to his mother and requested that she assist him in obtaining a lawyer by contacting a cousin. Accordingly, we deem this argument without merit.

### Testimony of Dr. Goldberg

Next, defendant asserts that the trial justice erred when she allowed Dr. Goldberg to testify regarding what defendant characterized as "physical examination, diagnosis, and treatment of penetrative first degree sexual assault[,]" as contrasted with the second-degree sexual assault of which he was accused. During trial, the state sought to introduce the testimony of Dr. Goldberg, an attending physician in the Child Protection Program at Hasbro who had examined Sarah on the night of the incident. At trial, Dr. Goldberg discussed her examination of the child, presented certain disclosures that Sarah made during her examination, and explained what was meant by an examination that was found to be normal. Doctor Goldberg testified that, on January 29, 2011, Sarah, in describing the incident and her physical condition, had told her "she felt wet," a symptom which, Dr. Goldberg explained, prompted her to evaluate the child for an acute sexual assault. Next, Dr. Goldberg testified that Sarah had some redness in her genital examination but that the rest of her physical examination appeared to be normal, which she explained to the jury meant that she saw no specific abnormalities. Doctor Goldberg went on to explain that a normal finding does not necessarily mean that the child was not abused. Although defense counsel objected numerous times throughout Dr. Goldberg's testimony, these objections were grounded on lack of materiality. Significantly, the witness was asked, without objection: "[a]nd that normal examination in your mind at the time, can you say for certain whether or not she was touched in the manner that you understood?" To which Dr. Goldberg replied, "[Sarah's] normal examination does not exclude the possibility of sexual abuse, or even penetration, in my

mind." Not only was there no objection to this question, there was no motion to strike this answer.

On appeal, defendant contends that the trial justice erred in admitting this testimony because it was irrelevant, beyond the scope of proper expert testimony, and substantially prejudicial. It is well settled that this Court will "review a trial justice's decision admitting or excluding evidence under an abuse of discretion standard." State v. Covington, 69 A.3d 855, 862 (R.I. 2013) (quoting State v. Brown, 42 A.3d 1239, 1242 (R.I. 2012)). "We will reverse a trial justice's ruling on the admissibility of evidence only where 'it constitutes a clear abuse of discretion.'" Id. (quoting Brown, 42 A.3d at 1242).

After a thorough examination of the record, this Court concludes that defendant failed to preserve this issue for appellate review. We note at the outset that, prior to Dr. Goldberg's testimony, defense counsel expressly agreed that "[Dr. Goldberg could] testify as to what the absence of any injuries means, and [could] also testify as to the result of her examination." During Dr. Goldberg's direct examination she was asked, "[a]nd that normal examination in your mind at the time, can you say for certain whether or not she was touched in the manner that you understood?" To which Dr. Goldberg answered, "[h]er normal examination does not exclude the possibility of sexual abuse, or even penetration, in my mind." As noted, defense counsel did not object to the question, or move to strike the answer. Therefore, according to this Court's "raise-or-waive" doctrine, we deem defendant's argument that the trial justice erred in permitting Dr. Goldberg to testify waived.[6] However, were this issue properly preserved before the Court, we are convinced that Dr. Goldberg's testimony—which was equivocal at best—was not unduly

---

[6] See Berard v. HCP, Inc., 64 A.3d 1215, 1219 n.2 (R.I. 2013) (noting that the Court "shall 'not review issues that were not presented to the trial court in such a posture as to alert the trial justice to the question being raised[.]'" quoting State v. Kluth, 46 A.3d 867, 876 (R.I. 2012)).

prejudicial or implied that defendant engaged in sexual penetration, as the trial justice instructed the jury "that there is no evidence in this case of the type of conduct that this doctor just referred to * * *." It is also significant that defendant was not charged with first-degree sexual assault and that he, through his confession, admitted to improperly touching Sarah, the act that led to the charge of second-degree child molestation for which he was convicted.

In addition, "because the state bears the burden of proving each element of the charge beyond a reasonable doubt, it has the right to present evidence establishing those elements in its case in chief." State v. Marmolejos, 990 A.2d 848, 852 (R.I. 2010). Here, the child's disclosure to Dr. Goldberg, about feeling "wet," prompted the physical examination about which the witness testified. Thus, the state was within its rights to present testimony about the examination.

## Motion for Judgment of Acquittal

Lastly, defendant asserts that the trial justice erred in denying his motion for judgment of acquittal. "When passing on 'a trial justice's denial of a motion for judgment of acquittal, this Court applies the same standard as the trial justice.'" State v. Long, 61 A.3d 439, 445 (R.I. 2013) (quoting State v. Lynch, 19 A.3d 51, 56 (R.I. 2011)). "A motion for a judgment of acquittal should be granted only if the evidence, viewed in the light most favorable to the prosecution, is insufficient to establish the defendant's guilt beyond a reasonable doubt." Id. (quoting State v. Heredia, 10 A.3d 443, 446 (R.I. 2010)). "If, however, a reasonable juror could find the defendant guilty beyond a reasonable doubt, the motion should be denied." Id. (quoting Heredia, 10 A.3d at 446).

Viewing the evidence "in the light most favorable to the state" and "giving full credibility to the state's witnesses," we conclude that sufficient evidence existed to prove, beyond a

reasonable doubt, that the defendant committed one count of second-degree child molestation, in violation of § 11-37-8.3. See Lynch, 19 A.3d at 56. In this case, the six-year-old child took the stand at trial and testified that, on the night of the incident, she woke up, felt something on her vagina, and opened her eyes to the defendant standing at her bed. Sarah's mother also testified at trial and corroborated the child's statements and the events of that night. According to Sarah's mother, on January 29, 2011, she had put her daughter to bed with her jeans and underwear pulled up to her waist. At approximately one o'clock in the morning, she saw someone leaving her daughter's room; and, when she went into the room, she discovered that her daughter's pants and underwear had been pulled down below her waist. She testified that she took Sarah into her room, locked the door, and asked her if the defendant touched her, to which Sarah replied, "yes." Doctor Goldberg testified that Sarah told her that the defendant had been in her room that night and that "she felt wet." Further, Det. Jones also testified at trial and read the defendant's sworn statement, which stated:

> "On January 28, 2011, I was out drinking * * *. Then I went to check on [Sarah]. I noticed that she had jeans on, and she looked very uncomfortable. * * * I went over to [her] and pulled her jeans down. The jeans were so tight that her underpants came down with the jeans. * * * I was always curious if a young girl felt the same as a woman. * * * After [Sarah's] underpants came down with her jeans, I saw her vagina. * * * So I touched the outside of [her] vagina with my hand."

"A person is guilty of a second degree child molestation sexual assault if he or she engages in sexual contact with another person fourteen (14) years of age or under." Section 11-37-8.3. Because we are satisfied that the state presented ample evidence that Sarah was six years old when the defendant touched her vagina, in violation of § 11-37-8.3, we conclude that there was sufficient evidence to withstand the defendant's motion for judgment of acquittal and to support the conviction. Accordingly, the trial justice did not err when she denied the defendant's

motion for a judgment of acquittal.

## Conclusion

For the reasons articulated in this opinion, we affirm the judgment below. The papers in this case may be remanded to the Superior Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  State v. Joseph Armour.

**CASE NO:**  No. 2013-110-C.A.
(P2/11-779A)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  March 17, 2015

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**  Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Kristin E. Rodgers

**ATTORNEYS ON APPEAL:**

For State:  Lauren S. Zurier
Department of Attorney General

For Defendant:  Kara J. Maguire
Office of the Public Defender