**STATE**

v.

**Joseph L. HALL.**

No. 2006–84–C.A.

Supreme Court of Rhode Island.

Jan. 30, 2008.

---

Virginia M. McGinn, Esq., Providence, for Plaintiff.

Paula Rosin, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

"There are some things you learn best in calm, and some in storm." [1] The defendant, Joseph L. Hall, appeals four convictions stemming from what first appeared to be a routine traffic stop on a stormy South Providence night. After the jury returned guilty verdicts on all counts, the trial justice deemed the defendant to be a habitual offender and enhanced his sentence pursuant to G.L. 1956 § 12–19–21.[2] The issues raised before this Court are (1) whether showing a single photograph of the defendant to a police officer, while the suspect still was at-large and only an hour after the officer struggled with him, was an identification procedure so unnecessarily suggestive and unreliable that its admission into evidence denied the defendant due process of law and thereby tainted the officer's subsequent in-court identification; (2) whether another witness had sufficient personal knowledge to testify about the identity of the perpetrator; (3) whether the statements made by the defendant at the police station should have been ruled inadmissible because they were improperly induced by promises and therefore involuntary; and (4) whether the Habitual Offender Act's [3] requirement that a judge determine the fact of prior convictions violates a defendant's right to a jury trial under both the United States and Rhode Island Constitutions. We affirm the judgment of conviction.

1. Willa Cather, *The Song of the Lark* 443 (Houghton Mifflin Company) (1915).

2. General Laws 1956 § 12–19–21 provides:
 "(a) If any person who has been previously convicted in this or any other state of two (2) or more felony offenses arising from separate and distinct incidents and sentenced on two (2) or more occasions to serve a term in prison is, after the convictions and sentences, convicted in this state of any offense punished by imprisonment for more than one year, that person shall be deemed a 'habitual criminal.' Upon conviction, the person deemed a habitual criminal shall be punished by imprisonment in the adult correctional institutions for a term not exceeding twenty-five (25) years, in addition to any sentence imposed for the offense of which he or she was last convicted. No conviction and sentence for which the person has subsequently received a pardon granted on the ground that he or she was innocent shall be considered a conviction and sentence for the purpose of determining whether the person is a habitual criminal.
 "(b) Whenever it appears a person shall be deemed a 'habitual criminal,' the attorney general, within forty-five (45) days of the arraignment, but in no case later than the date of the pretrial conference, may file with the court a notice specifying that the defendant, upon conviction, is subject to the imposition of an additional sentence in accordance with this section; *provided, that in no case shall the fact that the defendant is alleged to be a habitual offender be an issue upon the trial of the defendant, nor shall it be disclosed to the jury. Upon any plea of guilty or nolo contendere or verdict or finding of guilty of the defendant, a hearing shall be held by the court sitting without a jury to determine whether the person so convicted is a habitual criminal.* Notice shall be given to the defendant and the attorney general at least ten (10) days prior to the hearing. Duly authenticated copies of former judgments and commitments which comprise the two (2) or more prior convictions and imprisonments required under this section shall be prima facie evidence of the defendants former convictions and imprisonments. If it appears by a preponderance of the evidence presented that the defendant is a habitual criminal under this section, he or she shall be sentenced by the court to an additional consecutive term of imprisonment not exceeding twenty-five (25) years; and provided further, that the court shall order the defendant to serve a minimum number of years of the sentence before he or she becomes eligible for parole." (Emphasis added.)

3. We refer to § 12–19–21 as the Habitual Offender Act throughout this opinion.

# I

## Facts and Procedural History

The weather took a decided turn for the worse immediately after Providence Police Officer Michael Gammino began his tour of patrol duty during the evening hours of October 22, 2005. While on his way back to the police station to pick up his raincoat, Officer Gammino saw a white Mitsubishi make a right turn without using a turn signal. Activating his siren and overhead lights, the officer attempted to make what he thought would be a routine traffic stop. However, instead of stopping, the driver of the white car "put the pedal to the metal" and fled. A chase ensued, and the officer continued to pursue as the driver of the white car traveled at excessive speed through several neighborhood streets, making a U-turn at one point. Officer Gammino later testified that when the driver made the U-turn, he could see that a black male was alone in the car. Finally, in a last-ditch effort to lose the police car, the driver of the fleeing vehicle attempted a hard right turn onto Potters Avenue. This maneuver was unsuccessful because the white car collided with the front driver's side of a green Honda that was stopped at a red light at Potters Avenue and Broad Street. The crash ended the vehicle chase, but not the storm that was now raging.

The driver of the green vehicle was Ramona Nunez; also in this car were a front-side passenger, Jelissa Batista, and Janette Paolino in the backseat.[4] Nunez later testified that while she was stopped at the traffic light, police sirens caused her to look to her left. When she did, she saw a police car chasing a white Mitsubishi down the street. She testified that the driver tried to "fake" a turn, but instead collided with the left-front-quarter of her car.

Nunez also testified that despite the rainy conditions she had a clear view of the driver because the street was well lit and the interior light of the white car went on at some point. Furthermore, she said that after the collision, the driver of the white Mitsubishi was "right there" in front of her.[5]

Nunez and Batista both testified that there was only one person in the white car. Nunez further said that she never took her eyes off him. She described him as a tall black male, approximately six feet three inches, with a "fade" style haircut,[6] who was wearing a black leather jacket and probably a black shirt underneath.

Nunez and Batista said that immediately after the collision the driver looked down and appeared to search for something in the car. Within seconds, Officer Gammino approached the white car with his service weapon drawn, yelling through the rain for the driver to come out with his hands up. When he did not do so, Officer Gammino

---

4. Nunez testified at the pretrial evidentiary hearing and then at trial. She testified to having picked out defendant from a photo-array at the police station, and then identified him in court. Batista testified only at the trial on the general events that transpired. She testified to seeing a single black male driving the white car, although she was unable to identify his face. Paolino was on vacation in the Dominican Republic at the time of trial and so did not testify.

5. Photographs of the accident scene confirm that Nunez's car was within a few feet from the driver's side of the white car.

6. *"Fade or Temple Fade*—a short tapered cut. The hair at the back and sides is tapered from zero length lower down up to around half an inch. The hair may be short or longer over the crown of the head. On top, the hair is longer (up to 2 to 3 inches) and may be layered." Available at http://www. hairboutique.com/tips/tip21042.htm, last accessed on January 8, 2008.

forcibly removed him. The officer and Nunez both noticed that the driver had a small black handgun in his hand. A fierce struggle ensued between the officer and the driver, and a shot was fired.

Officer Gammino testified that when the driver stepped out of the white car, he had to look up at him because of the differences in their respective heights. Officer Gammino said that he was six feet one-inch tall, but the driver was significantly taller, at about six feet five inches. He testified that he was face-to-face with the driver during the struggle, describing the suspect as a black male weighing about 240 pounds. The officer testified that after the driver's gun discharged, the driver immediately dropped it, letting it fall onto the driver's side floor of the white car.

Ultimately, the driver broke free from Officer Gammino's grasp and escaped into the night. Officer Gammino and other police officers, including Sgt. Carl Weston, Officer Gammino's supervisor, did not give up; they spent approximately forty minutes searching the area, but to no avail.

Back at the scene of the collision, the police searched the white Mitsubishi. They found a small black handgun and a payroll check made out to a Monica Moralez.[7] Sergeant Weston and Officer Gammino immediately went to the address printed on the payroll check. A young woman, who said she was Moralez's sister, gave them defendant's name as the possible driver of the car. Sergeant Weston already was familiar with Hall, and he went to the police substation to retrieve a photograph of him from the known-person database. Sergeant Weston showed this solitary photograph of Hall to Officer Gammino, who instantly identified the person depicted as the driver of the white Mitsubishi with whom he had struggled. Officer Gammino's positive identification occurred approximately an hour after the search for the driver ended and while the driver still was at-large.

Four months after the collision, Nunez was invited back to the station to give a written statement to the police. She was shown a six-photograph array of men who fit the approximate description that she previously had given to the investigating officers. She positively identified Joseph Hall's picture from the array, and she signed her name beneath it.

On January 7, 2006, Joseph Hall was arrested and brought to the police station. About an hour after his arrest, Hall was given a standard form, constituting a waiver of his *Miranda* rights[8] by Officer David Marchant and then-Det. John Garcia. Officer Marchant testified at a subsequent suppression hearing that even though Hall had one arm handcuffed to the wall, he read at least the first two portions of the rights form aloud. Officer Marchant also testified that he had directed Hall to read the rest of the form to himself silently, after which Hall signed the bottom of the form, indicating that he understood his rights. Officer Marchant then said that he asked Hall whether he wanted to waive his right to be silent and give a statement to the police. Officer Marchant testified that Hall was cooperative after the arrest and that he also was eager to tell his side of the story, even though he declined to commit his statement to writing. In his oral statement, Hall admitted to driving the white Mitsubishi, and claimed that he was out that night looking to buy marijuana. Hall told Officer Marchant that he picked up a man whom he did not know, but who he thought would have marijuana. Ac-

---

7. Monica Moralez was defendant's girlfriend, and the car belonged to her mother.

8. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

cording to Hall, this unidentified, would-be marijuana provider possessed the gun later recovered from the white Mitsubishi. Together, the pair decided to seek out drug dealers whom they could rob for money, but instead they ended up in a police pursuit when Hall took his inopportune turn in front of Officer Gammino. Hall admitted only to crashing the car and pushing the officer in an effort to escape. Even though Hall said he did not know the name of the man with the gun, he described him as a black male who was approximately five feet nine-inches tall.

At approximately ten o'clock that same night, Agent Edward Troiano of the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATFE) arrived at the police station to speak with Hall. Agent Troiano had Hall read aloud all the rights enumerated on the standard rights form. Hall also initialed each point enumerated to indicate that he understood the form. Agent Troiano then told Hall that if he understood his rights, he needed to check off the box on the form and sign beneath it. Hall did so. Agent Troiano then indicated he would take a taped statement from Hall; the agent spoke with him briefly before turning on the tape recorder. During this conversation, Agent Troiano testified that he spoke to Hall about the potential for both federal and state charges, and he also said that if Hall was cooperative and truthful, he would advise the prosecutor and judge of his cooperation. Hall then gave an oral statement that was recorded on a compact disc and later transcribed for the jury. It was consistent in substance with the earlier statements made to Officer Marchant, which were not provided to the jury.

On the recording, Hall repeated his story that he had borrowed his girlfriend's mother's car to look for marijuana. He said that a man got into his car and showed Hall a small black handgun. Hall said that he held the gun for a moment as he drove, but then gave it back to his passenger. He maintained that the two had hatched a plan to rob drug dealers, when Officer Gammino attempted to pull them over. Hall admitted to trying to elude the police and to crashing the car. He said that the officer then pulled him out of the car through the window and a struggle ensued, after which he escaped. Hall denied firing a gun, or even hearing a gunshot. He told Agent Troiano that he never possessed the weapon and that the owner of the gun was his passenger, whom he described as a black male, of medium weight and build, and about five feet nine-inches tall.

The state charged defendant with (1) unlawfully carrying a pistol without a license, (2) unlawfully possessing a firearm after previously having been convicted of a crime of violence, (3) discharging a firearm within the limits of the City of Providence, (4) assaulting a police officer, (5) eluding a police officer, and (6) resisting arrest. However, counts three and six ultimately were dismissed, and before the jury was convened both parties agreed that if Hall was convicted on count one, then he would automatically be found guilty of count two.[9]

Prior to trial, an evidentiary hearing was held on defendant's motion to suppress the identifications made by Officer Gammino and Nunez, and the statements made by Hall while in police custody, as required by *State v. Amado*, 424 A.2d 1057, 1061 (R.I. 1981). At the conclusion of the hearing, and after he assessed the testimony of Agent Troiano, Ramona Nunez, and offi-

---

9. This required a stipulation that Hall had been convicted of a prior crime of violence, allowing defendant to keep the knowledge of his prior conviction from the jury.

cers Marchant and Gammino, the trial justice ruled that all the evidence would be admitted at trial. He found that despite the use of a single photograph, the out-of-court identification by Officer Gammino was not improper under all the circumstances of the case, and that Gammino's identification of Hall also was independently reliable. The Court also ruled that Nunez had had a sufficient opportunity to view the driver to allow her to testify as to his identity, and that other issues with respect to her eyesight, the stormy conditions, and street lighting, were all within the province of the jurors, after exploration through cross-examination. Finally, the Court found that the recorded statement given to Agent Troiano was freely and voluntarily made.[10]

At trial, the state offered testimony from Nunez, Officer Gammino, Agent Troiano, Sgt. Weston, Robert Yekelchek (a firearms analyst), and Batista. The state also offered the out-of-court identifications of Officer Gammino and Nunez, and had Officer Gammino and Nunez identify defendant in court, as well. The jury also listened to defendant's recorded statement, following along with the transcript.

At the close of the evidence, the jury returned guilty verdicts on all counts. The defendant was sentenced to serve two concurrent sentences of ten years for unlawfully carrying a pistol and unlawfully possessing a firearm after previously having been convicted of a crime of violence. He received a one-year sentence for the simple assault, but the sentence was suspended, with probation, and a five-year sentence for eluding a police officer, which also was suspended, with probation. The defendant also received a sentence of an additional fifteen, non-parolable, years incarceration under the Habitual Offender Act, with another six years of suspended/probationary time upon his release.[11]

On appeal, defendant argues that (1) Officer Gammino's out-of-court identification was a "show-up" and that it was unnecessarily suggestive and unreliable, and his in-court identification was impermissibly tainted by the out-of-court identification; (2) Nunez had insufficient personal knowledge to be considered a competent witness under Rule 602 of the Rhode Island Rules of Evidence; (3) Hall's recorded statements to Agent Troiano were involuntary because they were coerced by promises of leniency; and that (4) to increase a defendant's sentence under the Habitual Offender Act, the fact of prior convictions must be in the information or indictment and proven to a jury beyond a reasonable doubt to satisfy a defendant's right to jury trial as required by the Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution.

## II

### The Identifications by Officer Gammino and Nunez

#### A. Due Process of Law

When we review a trial justice's decision to deny a motion to suppress an identification, we adhere to the clearly erroneous standard. *State v. Texter*, 923 A.2d 568, 573 (R.I.2007). In determining whether the denial of a defendant's motion

---

10. Defense counsel did not dispute the admissibility of defendant's statement to Officer Marchant. That statement, however, was not introduced at trial.

11. The defendant already was serving a seven-year sentence at the time he was sentenced in this case. The trial justice ordered that the sentences in this case were to be served consecutively to the sentence he already was serving.

to suppress an identification was clearly erroneous, we assess the available evidence in the light most favorable to the state. *Id.*

A witness's out-of-court identification is not admissible at trial if the identification procedure employed by the police was "so unnecessarily suggestive and conducive to a substantial likelihood of misidentification that the accused was denied due process of law." *State v. Holland,* 430 A.2d 1263, 1269 (R.I.1981) (citing *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). We use a two-step procedure to determine whether the identification procedures the police employed violated a defendant's right to due process of law. *State v. Camirand,* 572 A.2d 290, 293 (R.I.1990). First, "the [C]ourt must consider whether the procedures used in the identification were unnecessarily suggestive." *Id.* If any of the procedures are found to have been suggestive, the second step requires a determination of whether the identification still has independent reliability despite the suggestive nature of the identification procedure. *Id.* (citing *State v. Nicoletti,* 471 A.2d 613, 615 (R.I.1984)).

Recently, we reaffirmed the principle that show-up confrontations, while disfavored, are not *per se* offensive. *Texter,* 923 A.2d at 574 (citing *State v. Turner,* 561 A.2d 869, 871 (R.I.1989)). Indeed, the "admission of evidence of a show up without more does not violate due process." *Manson v. Brathwaite,* 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (citing *Biggers,* 409 U.S. at 198, 93 S.Ct. 375); *see also Texter,* 923 A.2d at 574 (holding that showing the victim a single suspect was not improper under the circumstances). The United States Supreme Court has said that "[i]t is the likelihood of misidentification which violates a defendant's right to due process * * *. Suggestive confrontations are disapproved because they in-

crease the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Biggers,* 409 U.S. at 198, 93 S.Ct. 375.

In *Texter,* 923 A.2d at 571, the defendant singly was brought before the complainant for the purpose of identification. The complainant was a high school student who had been sexually assaulted while she was walking to school. *Id.* at 570. She positively identified the defendant, who had been apprehended near the school. *Id.* at 571. He matched the description she had provided to the police, and he had in his possession various items that she had described to the police, as well. *Id.* at 571, 572. We held that although there is some inherent suggestiveness with an identification procedure when only one person is displayed, it was not unduly suggestive to do so under the particular facts in that case. *Id.* at 574.

In the present case, Officer Gammino was an experienced police officer, not a layperson. In our opinion, this makes him less likely to be affected by a "suggestive" procedure. Although we have repeated that "the prosecution is not required to demonstrate that exigent circumstances existed which necessitated the use of a show-up procedure rather than another type of procedure," those circumstances certainly were present when Officer Gammino identified Hall from the picture shown to him. *Texter,* 923 A.2d at 574 (citing *State v. Ramos,* 574 A.2d 1213, 1215 (R.I.1990)). In our opinion, it is significant that the previously armed and aggressive suspect was still at-large; that is precisely the type of situation when such a procedure "may be necessary in order to avoid the mistaken apprehension of the wrong person." *Id.* (quoting *United States v. Watson,* 76 F.3d 4, 6 (1st Cir.

1996) (holding that "a show-up conducted immediately after the commission of the offense at issue in that case was not unnecessarily suggestive")). We hold that under all the facts present here, the procedure used was not unduly suggestive.

However, even if we held that the out-of-court identification was improper, we would still concur with the trial justice that Officer Gammino's identification of defendant Hall also was independently reliable. Assessing reliability requires consideration of the totality of circumstances surrounding the identification and, in particular, "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *State v. Parker*, 472 A.2d 1206, 1209 (R.I.1984) (quoting *Biggers*, 409 U.S. at 199, 93 S.Ct. 375).

There is no question that Officer Gammino had a substantial opportunity to view defendant. He testified that he could see perfectly and that he saw defendant's face when defendant was in his car and when he did a U-turn past Officer Gammino's car. Later, he had a much closer view when they began to struggle, face-to-face. It is clear to us that the suspect, who had just attempted to flee in a motor vehicle and then struggled to escape in a close physical encounter that involved a firearm, had all of Officer Gammino's attention. Before he identified Hall from a photograph at the police station, the officer described the suspect as an unusually tall black male. When he viewed the photograph of Hall, Officer Gammino immediately was certain that Hall was the man whom he had chased, who had crashed the white Mitsubishi into Nunez's car, and who had struggled with him. Finally, Officer

Gammino saw the photograph of Hall within in a reasonably short period after their physical confrontation, shortly after the crimes had occurred, and while the suspect was still at-large and the subject of a police manhunt.

For these reasons, and under all the attendant circumstances present in this case, we hold that the admission of Officer Gammino's out-of-court identification was neither unnecessarily suggestive nor unreliable, and therefore properly admitted by the trial justice. Furthermore, because the out-of-court identification was proper, Officer Gammino's in-court identification was not tainted, and properly was admitted at trial.

## B. Rule 602 of Rhode Island Rules of Evidence

 The defendant next raises the issue of whether Nunez could have had sufficient personal knowledge to testify at trial to the identification of Hall as the person who crashed into her vehicle on October 22, 2005. A trial justice's ruling on whether "the witness could not have actually perceived or observed the perpetrator" will be reversed only for an abuse of discretion. *State v. Gatone*, 698 A.2d 230, 238 (R.I. 1997) (citing *State v. McDowell*, 685 A.2d 252, 255 (R.I.1996)). Rule 602 of the Rhode Island Rules of Evidence states in pertinent part:

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself or herself."

In an effort to convince us that Nunez was an insufficiently percipient witness, defendant refers us to *State v. Ranieri*, 586 A.2d 1094, 1096 (R.I.1991). In that case, an elderly woman was attacked in

her home at night and from behind. *Id.* She never made an identification of the perpetrator, and when her second-floor tenant arrived to assist her, the victim said "[W]ho was doing this to me?" *Id.* She maintained for more than eighteen months that she did not see anyone. *Id.* at 1097. The tenant testified to seeing the perpetrator's upper lip for one to two seconds. *Id.* at 1096. In later testimony, he said that he saw the upper lip for up to one minute. *Id.* At trial, the victim and tenant both identified a young man who occasionally visited the victim's neighbor's home as the invader. *Id.* at 1099. The victim testified that she believed this young man had been "spying" on her through her neighbor's window shade for some time. *Id.* Furthermore, before the attack, she accused him of breaking into her house on five different occasions. *Id.* The tenant testified that the upper lip he saw was the same as this young man's. *Id.* at 1100. The tenant admitted to saving a photograph of the defendant, which appeared in the *Providence Journal* two weeks before he identified him as the assailant. *Id.* We held that both the victim and tenant were incompetent witnesses to testify to the identification of the assailant, and we vacated the judgment of conviction. *Id.* at 1099, 1101.

■ Unlike the situation in *Ranieri,* however, Nunez testified that she looked directly at the perpetrator as the white Mitsubishi careened into her front left fender. She testified that the lighting was good and that she did not take her eyes off defendant. She watched him as he searched in his car for something, as the police officer removed him from the vehicle, as the two men struggled, and as he ran off toward Gladstone Street. Immediately after the collision, she provided descriptions of the car that hit her and the

driver. She was able to quickly identify Hall the first time she was shown a photo-array, four months later.[12]

We cannot say that the hearing justice abused his discretion when he found that Nunez testified from her personal knowledge. The facts that the defense relies upon that the lighting and storm conditions blocked her view, and she should have been wearing eye glasses are all issues relating to her credibility as a witness. All of these issues were appropriate subjects for cross-examination. *See State v. Nhek,* 687 A.2d 81, 83 (R.I.1997) (citing *Ranieri,* 586 A.2d at 1098 ("The justice is not making a credibility determination and is not judging whether the witness is accurately and truthfully relating that which he perceived. * * * [Indeed, even] [i]n a situation in which the question of a witness's Rule 602 competency is close (that is, the jury could find that the witness perceived the matter testified to), the judge should admit the testimony since the matter then becomes one of credibility and is properly for the jury.")). In our opinion, this situation was not a particularly close call for the trial justice, and we agree with his ruling.

We are satisfied that Nunez had ample opportunity to view the perpetrator and there was no error in allowing her to testify as a witness, leaving any and all deficiencies in her perception to be properly explored by cross-examination before the jury.

## III

### Motion to Suppress Hall's Statement to Agent Troiano

■ The defendant next argues that the hearing justice erred when he admitted defendant's recorded statements into evi-

---

12. The defendant concedes that this array was proper in all respects.

dence. He contends that his statement was involuntary because Agent Troiano said that if Hall cooperated and gave a true statement, Agent Troiano would so advise the prosecutor and the court. Both the United States and Rhode Island Constitutions forbid the use of a defendant's involuntary confession. *State v. Humphrey,* 715 A.2d 1265, 1274 (R.I.1998) (citing *State v. Griffith,* 612 A.2d 21, 25 (R.I. 1992)).

 This Court employs a two-step review of a trial justice's determination that a confession was voluntary. *Humphrey,* 715 A.2d at 1273. First, we review the trial justice's findings of historical fact with deference. *Id.* We will not overturn those findings unless they are clearly erroneous. *Id.* (citing *State v. Bailey,* 677 A.2d 407, 410 (R.I.1996)). Second, because this issue is of constitutional dimension, we accept the historical facts and credibility determinations, and then conduct a *de novo* review of the trial justice's conclusion that the confession was voluntary. *Id.* (citing *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) and *State v. Campbell,* 691 A.2d 564, 569 (R.I. 1997)). Because there is no dispute with respect to the facts attendant to Hall's confession to Agent Troiano, we will engage in a *de novo* review to determine whether Hall's confession was voluntary. It is the prosecution's burden to prove by clear and convincing evidence that it was. *See Amado,* 424 A.2d at 1061 (citing *State v. Espinosa,* 109 R.I. 221, 230, 283 A.2d 465, 469–70 (1971)).

 A voluntary statement is a product of free will and rational choice, but a statement is deemed to be involuntary when the defendant's will was overcome by coercion, threats, violence, or undue influence. *Humphrey,* 715 A.2d at 1274. "The determination of whether or not a confession was freely and voluntarily made must be made in light of the totality of the circumstances surrounding the challenged statement." *Id.* (citing *State v. Pacheco,* 481 A.2d 1009, 1026 (R.I.1984)).

In *State v. Marini,* 638 A.2d 507, 513 (R.I.1994) (citing *United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir.1978)), we said that "[i]t is well-established that admonitions by the police to tell the truth do not render a subsequent confession involuntary." Furthermore, "[l]aw enforcement agents are also permitted to tell an accused that his cooperation would be 'helpful' to him, * * * and that a confession would 'make it better.'" *Id.* (citing *United States v. Davidson,* 768 F.2d 1266, 1271 (11th Cir.1985) and *State v. James,* 459 So.2d 28, 30–31 (La.Ct.App.1984)).

The defense concedes that this Court has held that statements encouraging cooperation do not necessarily render a confession involuntary. *See State v. Monteiro,* 924 A.2d 784, 791 (R.I.2007) (holding that telling a juvenile it was in his best interest to provide the police with the truth did not render his statement involuntary). The defendant maintains that some social science researchers believe that such encouragement may undermine an individual's desire to remain silent. However, we see little merit in the arguments advanced by defendant, and will apply the law as it stands. Under the totality of circumstances, we do not conclude that Agent Troiano's statement encouraging truthfulness and cooperation, whether made prior to recording Hall's statements or afterwards, rises to the level of a "promise" or "unlawful inducement" that could bend a man's will, causing him to wrongly confess.

To begin, Hall properly was informed of his *Miranda* rights on two separate occasions on the same day, while at the police station. Hall had prior experience with the police, and he was able to read the forms aloud without difficulty. Hall waived his rights, choosing to tell his side

of the story to both Officer Marchant and Agent Troiano. Furthermore, although defendant had one arm in a handcuff affixed to the wall, there is nothing in the record to suggest that he even was uncomfortable.

Also, we find it particularly significant that although Hall implicated himself in the less serious crimes at play, he consistently maintained that the firearm belonged to someone else. *See Monteiro,* 924 A.2d at 791 (juvenile's statement was deemed voluntary where he implicated himself only in the less serious crimes, while pointing the finger at another gang member for the actual shooting); *Pacheco,* 481 A.2d at 1016 (defendant's statement to police in which he attempted to exculpate himself from the crime was a factor to consider). Here, Hall first told his story to Officer Marchant in a statement that defendant does not even argue was involuntary, and then he gave substantially the same story again to Agent Troiano.

In our review of the record, and keeping in mind that Hall made a considered effort to shift responsibility for the most serious charges to a fictitious passenger, we believe that the "defendant's statement demonstrates that he was calculating and cunning and understood the gravity of his position * * *. This fact weighs in favor of a finding of voluntariness." *Monteiro,* 924 A.2d at 791. Therefore, we hold that the trial justice properly admitted defendant's statements into evidence at trial because defendant's statements were voluntarily given, despite Agent Troiano's declaration to defendant that his cooperation would be made known to the prosecutor and court.

## IV

### The Right to Trial by Jury and the Habitual Offender Act

■ The defendant's final argument attacks the enhanced sentence he received under § 12–19–21, after the sentencing justice deemed him to be a habitual criminal. The defendant filed a motion to strike habitual offender notice, arguing that the fact of a prior conviction had to be alleged in the indictment or information and that Hall's prior convictions also must be proven as a fact beyond a reasonable doubt to a jury. He argued that because it allows the trial justice alone to designate him a habitual criminal by a preponderance of the evidence, the statute runs afoul of the United States and Rhode Island Constitutions. The Court denied the motion, and defendant renewed his objections at the sentencing hearing, at which Hall was sentenced to serve an additional fifteen years for being a habitual criminal.

On appeal, defendant argues that the United States Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which held that prior convictions did not require a jury determination for sentencing enhancement, is on shaky constitutional ground and is ripe for reversal. Conceding that *Apprendi* remains good law today, defendant speculates that its future looks bleak in the aftermath of *Blakely v. Washington,* 542 U.S. 296, 301, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), where the Court held that all facts that increased the maximum sentence of a defendant, *except for prior convictions,* must be found by a jury. In addition, defendant argues that this Court has interpreted Rhode Island's constitutional provisions preserving the right to a jury as providing even greater protection than the United States Constitution, and we should hold that they provide so here.

■ When reviewing a constitutional challenge to a statute, this Court will use the "greatest possible caution." *Cherenzia*

*v. Lynch,* 847 A.2d 818, 822 (R.I.2004) (quoting *Gorham v. Robinson,* 57 R.I. 1, 7, 186 A. 832, 837 (1936)). The statute bears a presumption of validity, and it is the defendant's burden to prove beyond a reasonable doubt that it is unconstitutional. *Id.; see also In re Opinion to the Governor,* 62 R.I. 200, 211, 4 A.2d 487, 488 (1939).

Recently, in *State v. Ramirez,* 936 A.2d 1254, 1257 (R.I.2007), we addressed the issue of whether the Sixth Amendment to the United States Constitution requires a prior conviction to be proven before a jury to increase a defendant's sentence beyond the prescribed maximum. In *Ramirez,* the defendant was sentenced to life imprisonment for first-degree murder. *Id.* At sentencing, the trial justice found, by a preponderance of the evidence, that the defendant satisfied the requirements of the Habitual Offender Act and he received a twenty-five-year enhancement as a habitual offender pursuant to the statute. *Id.* Ramirez brought the identical federal constitutional challenge to his enhanced sentence that this defendant advances here, arguing that the Habitual Offender Act was applied in an unconstitutional manner because the enhanced sentence was based on facts that were not found by the jury, as required by the Sixth Amendment to the United States Constitution. *Id.* at 1268. This Court held that, in accordance with United States Supreme Court precedent, the fact of a prior conviction does not need to be proven to a jury beyond a reasonable doubt. *Id.* at 1270 (citing *Cunningham v. California,* ── U.S. ──, ──, 127 S.Ct. 856, 864, 166 L.Ed.2d 856 (2007)). Accordingly, Hall's first argument requires little further analysis and must fail.

Having dispatched Hall's argument with respect to the United States Constitution, we now turn our attention to his contention that the statute violates the Rhode Island Constitution. This requires a somewhat different analysis. Although defendant cites only article 1, section 10, of the Rhode Island Constitution, this Court has said that the various provisions in article 1 of the Rhode Island Constitution, pertaining to the right to a jury, including sections 7 and 15, all must be read together.[13] *In re Opinion to the Governor,* 62 R.I. at 204, 4 A.2d at 489. Indeed, "[t]he right to trial by jury has its own unique basis under the Rhode Island Constitution." *State v. Vinagro,* 433 A.2d 945, 946 (R.I.1981).

In *Vinagro,* the defendant was convicted by the District Court of four violations of the "Cruelty to Animals" statute. *Id.* at 945. The defendant kept pit bulls for the purpose of having them take part in fights. *Id.* The defendant was fined the maximum amount provided by the applicable

---

**13.** Article 1, section 7, of the Rhode Island Constitution states in relevant part:

"no person shall be held to answer for any other felony unless on presentment or indictment by a grand jury or on information in writing signed by the attorney-general or one of the attorney-generals designated assistants, as the general assembly may provide and in accordance with procedures enacted by the general assembly. The general assembly may authorize the impaneling of grand juries with authority to indict for offenses committed any place within the state and it may provide that more than one grand jury may sit simultaneously within a county. No person shall be subject for the same offense to be twice put in jeopardy. Nothing contained in this article shall be construed as in any wise impairing the inherent common law powers of the grand jury."

Article 1, section 10 states in relevant part:

"In all criminal prosecutions, accused persons shall enjoy the right to a speedy and public trial, by an impartial jury; * * *."

Article 1, section 15 states in relevant part:

"The right of trial by jury shall remain inviolate."

statute, $50 per charge. *Id.* The statute provided for review of his convictions by writ of certiorari to the Supreme Court. *Id.* However, the defendant contended that he should get a *de novo* appeal to the Superior Court, and the opportunity to be tried in front of a jury. *Id.* at 946. The defendant conceded that he was "not entitled to have a jury trial under the Federal Constitution because the maximum penalty for each charge in the case at bar [was] a $50 fine," but contended that the Rhode Island Constitution's right to jury trial provided greater protection. *Id.* We agreed and held that the defendant was entitled to a jury trial. *Id.* at 947.

However, in *Vinagro,* we said that "the decisive issue presently before us is whether a defendant was entitled to a jury trial in 1842 for the type of *offense* with which [the defendant] is charged."[14] *Vinagro,* 433 A.2d at 947 (emphasis added). Unlike the situation in *Vinagro,* Hall is not charged with any discrete offense under the Habitual Offender Act. Rather, after he received a trial by jury and was convicted on the substantive offenses, his sentence was enhanced as a result of his impressive prior criminal record. *See State v. Sitko,* 457 A.2d 260, 261 (R.I.1983); *see also State v. Tregaskis,* 540 A.2d 1022, 1026 (R.I.1988).

The defendant argues that the United States Supreme Court has limited the distinction between an element to an offense and a sentencing enhancement, even while keeping its exception for recidivism, by requiring "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

doubt." *Blakely,* 542 U.S. at 301, 124 S.Ct. 2531 (citing *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348). However, recidivism "is as typical a sentencing factor as one might imagine." *Almendarez–Torres v. United States,* 523 U.S. 224, 230, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). In our opinion, "[t]he existence of a prior conviction is a simple historical fact which may be ascertained through official documents" and "it either exists as a matter of public record or it does not." *Ramirez,* 936 A.2d at 1271 (quoting *Commonwealth v. Allen,* 508 Pa. 114, 494 A.2d 1067, 1071 (1985) and *Commonwealth v. Aponte,* 579 Pa. 246, 855 A.2d 800, 811 (2004)). We, therefore, see no merit in Hall's argument that the Habitual Offender Act violates his right to a jury trial under the Rhode Island Constitution.

Finally, we see no public policy that would be advanced by having prior convictions proven to a jury. *See Ramirez,* 936 A.2d at 1271. Indeed, by requiring recidivism to be proven to a jury, we would directly contravene the intricate safety mechanisms that are in place to protect defendants from the potential prejudice of such disclosure of earlier offenses to the finders of fact.[15]

■ The defendant also contends that the facts attendant to deeming him a habitual criminal should be pled in the information or criminal complaint. However, because sentencing based on a finding that one is a habitual criminal is not an element of the offense charged, but rather "the enhanced punishment, * * * is only an incident to the last offense. The act does not create a new substantive offense. It merely prescribes a longer sentence for

---

**14.** The Rhode Island Constitution was ratified in 1842.

**15.** This is especially poignant because, as mentioned earlier, Hall stipulated that he had

been convicted of a crime of violence so he could keep this information from the jury. The result was that the jury convicted Hall only on three charges, not four.

the subsequent offenses which triggers the operation of the act." *Sitko,* 457 A.2d at 262 (quoting *Eutsey v. State,* 383 So.2d 219, 223 (Fla.1980)).

The defendant concedes that the enhancement was not triggered until defendant actually was convicted of the third offense. Only then does the trial justice give an enhanced sentence and only for that final conviction. *See Sitko,* 457 A.2d at 262 (state may not charge the defendant with being a habitual criminal by a separate indictment, seven months after sentencing already has taken place on the third offense). There simply is no legitimate purpose to require the fact of prior conviction to be contained in the information.

Therefore, we hold that the Habitual Offender Act does not offend the United States or Rhode Island Constitutions, and Hall properly was sentenced as a habitual offender.

## V

### Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court in all respects and return the papers thereto.