December 16, 2022

**Supreme Court**

No. 2020-4-C.A.
(K1/16-369C)

Concurrence begins on
page 35

State              :

v.               :

Josue Morillo.         :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Josue Morillo. | : |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** In the early morning hours of March 26, 2016, Michael Rogers and David Rogers were stabbed in their home in Warwick, Rhode Island, as they slept in their beds. Michael died.[1] The state appeals from a Superior Court order that granted a motion to suppress two statements given by the defendant, Josue Morillo (defendant or Morillo), to Warwick police detectives in the course of their investigation. The state argues that the trial justice erred in suppressing statements based on his findings that (1) the defendant was in custody when he voluntarily accompanied the detectives in an unmarked vehicle to search

---

[1] We refer to Michael Rogers and David Rogers by their first names for the sake of clarity because they share the same surname. We intend no disrespect by doing so.

- 1 -

for evidence; (2) the defendant did not knowingly, intelligently, and voluntarily waive his *Miranda* rights; and (3) the defendant's video-recorded statement, made after his arrest and additional *Miranda* warnings, was inadmissible in accordance with *Missouri v. Seibert*, 542 U.S. 600 (2004).

For the reasons set forth in this opinion, we vacate the order of the Superior Court and remand this case for limited factual determination by the trial justice consistent with this decision.

**Facts and Travel**

On the morning of March 26, 2016, Detective Gilda Fortier of the Warwick Police Department was called into work and learned that two people were stabbed at 149 Haswill Street, one of whom suffered life-threatening injuries. The sole suspect at the time—Jared Rogers (Rogers), a family member—was taken into custody that afternoon.

On March 29, 2016, Warwick detectives learned of three potential witnesses, Andrew Soben (Soben), John Ingram (Ingram), and defendant. Detective Fortier and Detective Thomas DiGregorio[2] were assigned to locate and interview Morillo. The detectives stopped at defendant's residence and, after speaking with his sister, were able to connect with Morillo by telephone. The detectives informed Morillo that, in the course of their investigation, he was identified as a potential witness to

_____

[2] Thomas DiGregorio had been promoted to Detective Sergeant by the time of the suppression hearing.

- 2 -

the incident at 149 Haswill Street.  Morillo was asked to come to the police headquarters to speak with them.  Morillo agreed.

After waiting a half-hour or so, Det. Fortier called Morillo again to check on his expected arrival; however, Morillo had already been located at Ingram's house in Cranston by Sergeant Falcofsky, who was tasked with locating Ingram.  Morillo and Soben followed Sgt. Falcofsky to police headquarters in Soben's car, arriving at approximately 1:35 p.m.  Detectives Fortier and DiGregorio conducted a series of interviews with Morillo throughout the afternoon.[3]  The facts as relayed by Morillo changed in each iteration, culminating in a full confession of his participation in this homicide.

### The First Statement

Detective Fortier testified that the first interview commenced around 2 p.m.—approximately twenty-five minutes after Morillo arrived at the station.  Morillo was taken into an interview room, where he was asked how he was acquainted with Rogers and what he knew about the incident that took place on March 26.  During this initial interview, the detectives learned that Morillo was with Soben and Ingram in Soben's car on the night of the stabbing, when they received a telephone call from Jake Cabral (Cabral).  Cabral asked them to pick

---

[3] We recount the evidence concerning four statements from the entire record, including the transcripts from two recorded interviews that took place at the Warwick Police Headquarters, which were played during the evidentiary hearing and admitted as full exhibits.

him up in North Providence, pick Rogers up from Kent Hospital, and give Rogers a ride home to 149 Haswill Street. According to defendant, upon arriving at Haswill Street, Soben boosted Rogers through his bedroom window and returned to the car, at which point Soben, with Morillo, Ingram, and Cabral, drove away—only to receive a telephone call moments later from Rogers asking them to pick him up from the parking lot at Warwick Veterans Memorial High School. Morillo indicated that they complied, and the group then headed towards North Providence to drop off Cabral and Rogers. Morillo told the detectives that, while driving to North Providence, Rogers may have thrown some knives out of the vehicle's window.

Detective Fortier testified that upon learning that knives may have been discarded and realizing that Morillo appeared to know more about the incident than they originally thought, the detectives explained that they were going to conduct a second interview with an audio recording device.

### The Second Statement

Approximately one hour after the first interview began, at 2:58 p.m., Det. DiGregorio commenced an audio-recorded interview by asking Morillo whether he (1) came to the police station voluntarily; (2) was giving a statement "freely of [his] own accord"; and (3) realized that he was free to leave at any time. Morillo answered each question in the affirmative. Detective DiGregorio also stated to

Morillo: "You realize * * * you're not gonna be charged with this as long as you provide * * * correct, accurate information." Morillo recounted many of the same details from the first interview; however, he added that at Rogers's request, Soben went into the house with Rogers at 149 Haswill Street to pick a lock to an inside door and came out after six to eight minutes, followed by a "worked-up" Rogers minutes later. In this second iteration, the group left Haswill Street together and headed towards North Providence.

Morillo also disclosed that, approximately a quarter-mile to a half-mile down Airport Connector Road from Post Road, he saw Rogers pull two kitchen knives out of his sweatshirt pocket and throw the knives toward the side of the roadway. Morillo described the two knives; one was only the handle of a knife, with a "wooden tip" and "two stainless steel dots on it[,]" and "the blade was completely off"; the other was a smaller black kitchen knife, with the blade still intact. Morillo also believed that Rogers threw a cell phone out of the window of the car on Interstate 95 in the proximity of the Providence Place Mall. When asked by Det. DiGregorio whether Morillo would be willing to go with the detectives to show them where the knives might be located, Morillo agreed. The recorded interview concluded at 3:32 p.m.

## The Third Statement

Immediately after the second interview ended, Morillo, without handcuffs, along with Dets. Fortier and DiGregorio and Sergeant Scott Robillard, exited through the rear of police headquarters to an unmarked detective's car. Morillo opened the rear door and let himself into the vehicle. Detective Fortier sat in the back seat next to Morillo; Det. DiGregorio sat in the front passenger's seat; and, Sgt. Robillard drove. Morillo told the officers where to stop to search for the knives; he exited the unlocked door, and walked alongside the road, searching for the knives. Unsuccessful, the group returned to the vehicle and headed toward the Providence Place Mall in another futile attempt to locate Rogers's cell phone in or on the side of the interstate.

Detective Fortier testified that Morillo began to appear nervous and unsure of himself and that the detectives began to notice inconsistencies in his story, at which point Det. DiGregorio advised Morillo of his rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966).[4] Detective Fortier documented the time as 5:10

---

[4] Detective Fortier described the circumstances giving rise to the reading of the *Miranda* warnings as follows:

> "A. * * * We took the state office exit going into downtown Providence. And it was at that point, as he's telling us or recanting the story, there was some inconsistencies to his story.
>
> "* * *

- 6 -

p.m., as reflected in her police narrative. According to Det. DiGregorio's testimony, because of the inconsistencies in Morillo's statements and the inability to corroborate his story about knives or a cell phone, at 5:10 p.m., while the vehicle was in Providence, he decided to advise Morillo of his rights.[5] Detective

---

"So, * * * he was now coming across as unsure, not as positive as he was in the first place. His demeanor was a little bit more nervous.

"So, at that point, based on not finding any evidence, his inconsistency, his demeanor, it was decided upon [Det.] DiGregorio to read him his *Miranda* rights at that point.

"Q. Okay. And did he read those rights verbally?

"A. He did.

"Q. And in their entirety?

"A. Yes."

[5] Detective DiGregorio testified that, when the vehicle was "right near the Providence Place Mall[,]" he advised Morillo of his rights. The detective testified as follows:

"A. And based on -- he had some inconsistent statements that he made to us during the first and the second interview which were on audiotape. And then I combined that with the fact that we weren't able to corroborate anything that he was saying in terms of locating evidence.

"So at that point, out of an abundance of caution, what I did was I advised Mr. Morillo of his rights.

"Q. Okay. And those were his *Miranda* rights?

- 7 -

DiGregorio turned around in the vehicle and advised Morillo of his *Miranda* rights in their entirety. According to the testimony of both Det. Fortier and Det. DiGregorio, when asked if he understood those rights, Morillo answered, "Yes." The defendant, on the other hand, testified that he had no memory that Det. DiGregorio was present in the police vehicle and no memory of having been advised of his rights.

Detective Fortier testified that the detectives then expressed their belief to Morillo that he was being untruthful and that "he was coming across as [if] he was obstructing." Detective Fortier further testified that, until the point when Morillo was advised of his *Miranda* rights, she would have permitted him to leave if he wished to do so, because he was thought to be a witness.

On the way back to headquarters the detectives learned that Morillo might have thrown a knife from Soben's car onto Main Avenue in Warwick after the stabbing. Thus, the group proceeded to Main Avenue, where a patrol vehicle was

---

"A. Yes.

"Q. And did you read them to him in their entirety?

"A. I did.

"Q. Okay. And did you ask him whether or not he understood those rights?

"A. I did. It was 5:10 [p].[m]. We were in the car. I advised him of his rights verbally. And I asked him if he understood. And he stated that he did."

already on the scene. According to Det. DiGregorio, the drive from Providence to Main Avenue took approximately ten to fifteen minutes. Sergeant Robillard and Det. DiGregorio exited the vehicle to look for a knife, and Det. Fortier and Morillo remained in the back seat. Detective Fortier testified that while in the back seat with Morillo she stated, "Everything's going to be okay. When we get back into the station, we will have this formal interview. And everything's going to be all right. You understand we are talking to all of your other friends as well. So we will get to the story." According to Det. Fortier, Morillo then stated: "I know" and "I stabbed David."[6] At this point, Morillo was arrested, placed in the patrol vehicle, and transported back to police headquarters, arriving at approximately 6:00 p.m.

### The Fourth Statement

At around 6:30 p.m., approximately thirty minutes after arriving at police headquarters, the detectives commenced an audio-video recorded interview with Morillo. Detective DiGregorio began by asking Morillo (1) whether he came to the station earlier that afternoon of his own free will; (2) when he arrived at the station that day, whether he understood he was free to leave; and (3) if he came

---

[6] It was Morillo's testimony that, on the way to Main Avenue from Providence, Det. Fortier informed Morillo of what she believed to have occurred, including that "[the detectives] kn[e]w that [Morillo] stabbed David Rogers"; and, after they arrived at Main Avenue, in response to a second assertion from Det. Fortier to Morillo that "[he] stabbed David Rogers[,]" Morillo stated "I stabbed him." The trial justice did not address this evidentiary conflict.

voluntarily. Morillo answered each question with an affirmative reply. This was the second time that Morillo acknowledged knowing that he was free to leave. Significantly, Det. DiGregorio asked Morillo if he remembered being advised of his *Miranda* rights at 5:10 p.m., when the detectives began to think that Morillo was being untruthful and had more involvement than originally suspected; Morillo answered, "Yeah." When Morillo was asked if he told the detectives that he understood those rights, Morillo responded, "Yes, Sir." The defendant asked no questions at that time. Detective DiGregorio then asked whether, after being advised of his rights, Morillo told the officers that he had discarded a knife on Main Avenue; Morillo stated, "Yeah."

In response to Det. DiGregorio's next inquiries, Morillo stated that his highest level of education was eleventh grade when he dropped out, but that he participated in online schooling, and that he could read and write in English. Then, Det. DiGregorio asked, "[s]o when I asked you did you understand your rights, you can intelligently say yes"; Morillo answered, "Yes." At this point, Morillo had verified that he understood the *Miranda* warnings on three occasions. The detectives then gave Morillo an "Advisement of Rights" form and asked him to read the first two rights in the list aloud.[7] Morillo did so without difficulty.

---

[7] The Advisement of Rights form listed the following rights:

"You have the right to remain silent.

Detective DiGregorio explained that he was going to have Morillo read the remainder of the rights silently and, "[i]f [he] underst[oo]d them all, [to] initial next to each one[.]" Before Morillo continued to review the form, Det. DiGregorio stated: "If you have any questions, ask me." As he read the form, the only question Morillo asked was "what am I being charged with?"; to which Det. DiGregorio responded, "[r]ight now, it looks like you might be charged with assault[.]"

Morillo read and initialed each of the remaining rights and checked off "yes" to the question: "Do you understand these rights explained to you?" Before Morillo signed the form, Det. DiGregorio stated: "If you understand your rights and you want to talk to us, then I'll go forward and we can talk." Morillo signed the form. At the suppression hearing, Morillo testified that he understood his rights, but that "I only understood the words. I didn't really understand what they really meant." When asked by the prosecutor why he did not tell the detectives

---

"Anything you say can and will be used against you in a court of law.

"You have the right to talk to a lawyer and have him present with you while you are being questioned.

"If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.

"You have the right to use a telephone to contact a lawyer at any time.

"You can decide at any time to exercise these rights and not answer any questions or make any statements."

that he did not understand the rights, Morillo stated, "I understood what was going on. I just didn't understand the severity of the whole scenario."

Because of the inconsistencies in Morillo's story concerning his involvement in the events of March 26, 2016, which evolved from his remaining in the car, to his active participation in these offenses, the detectives asked Morillo for a "detailed statement" of what took place from "beginning to end."

In the final rendition, Morillo explained that, after picking Rogers up from the hospital and bringing him to 149 Haswill Street, Rogers was expecting to encounter hostility from persons inside the house; so Soben, Ingram, and Morillo went inside with Rogers, while Cabral stayed in the car. Prior to entering the house, Rogers asked Morillo if he had a gun—in Morillo's opinion, this question was based on his recent gun charge. Soben boosted Rogers through the window, and Rogers opened the back door for Soben, Ingram, and Morillo.

According to Morillo, the house was quiet; everyone was sleeping, including Rogers's mother, sister, brother, and nephew. Rogers handed everyone a knife and gave Morillo two knives. Soben went upstairs with Rogers to pick the lock to Michael's bedroom door; then, Rogers came downstairs alone and led Morillo and Ingram to Rogers's brother David's bedroom in the basement, where he was sleeping. Morillo admitted to stabbing David in the stomach, but explained that the blade snapped. Morillo and Ingram ran upstairs and out the back door, and

Rogers remained in the basement struggling with his brother. After Ingram and Morillo entered the car, followed by Rogers and then Soben, Cabral drove off. As they approached the intersection of West Shore Road and Main Avenue, three police vehicles with lights and sirens were heading in the direction of Haswill Street, prompting Morillo to discard two knives that were in his possession—neither of which he used to stab David.[8] Morillo recanted his earlier statement that Rogers had thrown a broken knife out the window on Airport Connector Road and now admitted that he discarded the broken knife as he exited the basement.

The grand jury returned an indictment charging defendant with murder, conspiracy to commit murder, assault with intent to commit murder, and conspiracy to commit assault with intent to commit murder. The defendant moved to suppress all statements he made to the Warwick detectives on the grounds that "his statements to the police were not freely and voluntarily made after waiving his *Miranda* rights[.]"

A four-day suppression hearing ensued, and the trial justice denied the motion with respect to the first two statements and granted the motion with respect to the third and fourth statements. The state filed a timely appeal. Additional facts will be set forth as necessary to the issues before us.

---

[8] According to Morillo, one of the knives he discarded out the car window was a knife he kept in "the side console [of the car] just in case."

## Standard of Review

"When reviewing a trial justice's decision granting or denying a motion to suppress, we defer to the factual findings of the trial justice[.]" *State v. Storey*, 8 A.3d 454, 459-60 (R.I. 2010) (quoting *State v. Flores*, 996 A.2d 156, 160 (R.I. 2010)). This Court "will not overturn a trial justice's factual findings unless they are clearly erroneous." *State v. Gonzalez*, 254 A.3d 813, 817 (R.I. 2021) (quoting *State v. Tejeda*, 171 A.3d 983, 994-95 (R.I. 2017)). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. Grayhurst*, 852 A.2d 491, 513 (R.I. 2004) (quoting *State v. Briggs*, 756 A.2d 731, 736 (R.I. 2000)). "With respect to questions of law and mixed questions of law and fact involving constitutional issues, however, this Court engages in a *de novo* review[.]" *State v. Jimenez*, 33 A.3d 724, 732 (R.I. 2011) (deletion omitted) (quoting *State v. Linde*, 876 A.2d 1115, 1124 (R.I. 2005)). Whether a defendant was in custody and whether a waiver of constitutional rights was voluntary are questions that are reviewed *de novo*. *See id.*; *see also State v. Dumas*, 750 A.2d 420, 423 (R.I. 2000).

## Analysis

The United States Constitution guarantees that: "No person * * * shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const.,

Amend. V. As such, procedural safeguards designed to protect one's constitutional right against self-incrimination have evolved since the landmark holding in *Miranda*. *See State v. Perez*, 422 A.2d 913, 914-15 (R.I. 1980). For instance, in accordance with *Miranda*, "prior to custodial interrogation a suspect must receive explicit warnings concerning his constitutional privilege against self-incrimination and his right to counsel." *Grayhurst*, 852 A.2d at 513 (quoting *State v. Amado*, 424 A.2d 1057, 1061 (R.I. 1981)). In addition, "before a confession can be used at trial, the state must establish, by clear and convincing evidence, that the defendant knowingly and intelligently waived his or her right against self-incrimination and that the statement was voluntary." *State v. Monteiro*, 924 A.2d 784, 790 (R.I. 2007).

In a bench decision, the trial justice found that (1) Morillo was in custody at the point the officers "placed" him in the unmarked detective's vehicle; (2) Morillo "did not knowingly, intelligently, and voluntarily waive his rights" that were given in the detective's vehicle; and (3) viewing the fourth statement "in the context of [Morillo's third] statement[,]" the *Miranda* rights preceding the fourth statement were ineffective in apprising Morillo of his constitutional rights in accordance with *Seibert*. The state assigns error to each of these findings, which we address *seriatim*.

## Custody

It is well established that the warnings under *Miranda* and the application of the exclusionary rule to statements made in violation thereof arise only when a suspect is in custody and undergoing police interrogation. *See, e.g.*, *State v. Edwards*, 810 A.2d 226, 239 (R.I. 2002). In the absence of a formal arrest, however, a person is in custody "if, in view of all the circumstances, a reasonable person would believe that he or she was not free to leave." *Jimenez*, 33 A.3d at 732 (quoting *State v. Vieira*, 913 A.2d 1015, 1020 (R.I. 2007)). In determining whether a person is in custody, "a court may consider * * *: (1) the extent to which the person's freedom is curtailed; (2) the degree of force employed by the police; (3) the belief of a reasonable, innocent person in identical circumstances; and (4) whether the person had the option of not accompanying the police." *Briggs*, 756 A.2d at 737 (quoting *State v. Diaz*, 654 A.2d 1195, 1204 (R.I. 1995)).

Although the trial justice found that Morillo was in police custody when he was "placed" in the detective's vehicle, he also found, despite defendant's failure of memory on this point, that defendant was advised of his *Miranda* rights while the vehicle was in Providence and before he admitted that he stabbed David. Detective Fortier testified that until defendant was advised of his rights, he was free to leave.

The state argues that the custody of defendant commenced at the point when Det. DiGregorio advised him of his *Miranda* rights in the police vehicle.[9] It is undisputed, as found by the trial justice, that at the time he admitted to stabbing David, an admission that triggered his arrest, defendant had been advised of his rights by Det. DiGregorio. Because both custodial statements that were suppressed by the trial justice were obtained *after* the rights as required by *Miranda* were administered, we deem it unnecessary to address the issue of custody or when custody commenced.

We emphasize however, that we take no position on the correctness of the trial justice's findings that defendant was in custody at the time he voluntarily accompanied the detectives in the police vehicle, or the factors that were relied upon by the trial justice to reach this conclusion, because it is simply irrelevant to our analysis.

The trial justice did find, however, that the third statement, "I stabbed David" was not a knowing, intelligent, and voluntary waiver of defendant's privilege against self-incrimination. This finding served as the basis for what we consider to be the erroneous decision by the trial justice to suppress the fourth statement, based on *Seibert*, as discussed *infra*.

[9] We note that in response to the Court's inquiry and to his credit, defense counsel agreed that a custodial interrogation commenced when defendant was advised of his rights.

We thus turn to the question of whether the state met its burden of establishing that the third statement was a knowing, intelligent, and voluntary waiver of defendant's constitutional rights.

### "I stabbed David."

After Morillo was advised of his *Miranda* rights in the vehicle, the detectives expressed their belief that he was untruthful and that he was obstructing the investigation. The trial justice set forth several reasons for his conclusion that defendant's third statement was not voluntary, but coerced, such that defendant did not make a knowing and intelligent waiver of the constitutional privilege against self-incrimination.

We note there is some overlap in the trial justice's findings concerning the voluntariness of the third statement. The trial justice focused on what he characterized as a "forbidden" promise by Det. DiGregorio that defendant would not "be charged with this as long as [he] provide[d] * * * correct, accurate information." Although the trial justice recognized that an investigating officer's admonishment to a suspect to tell the truth and a suggestion that cooperation may be helpful is allowable under the law and does not render a subsequent confession involuntary, he declared that "a statement that rises to a promise or an unlawful inducement *that could bend an individual's will*" can render a confession

involuntary. (Emphasis added.) He failed to specifically find that the "forbidden" promise did in fact overcome Morillo's will.

The trial justice also drew an inference that the statement was not voluntary, based on the duration of the interrogation, defendant's age and eleventh-grade education, and the timing of the third statement, which he characterized as "almost immediately" after the *Miranda* warnings which, he declared "demonstrate[d] that the defendant did not truly understand or comprehend the rights that were being provided to him," such that he could not reasonably believe he had a right to remain silent. Because this latter finding is more closely connected with the question of whether defendant's admission was knowing, intelligent, and voluntary—rather than compelled—we first address the so-called promise made by Det. DiGregorio, which the trial justice relied upon in finding that the statement was coerced.

## A

## "The Promise"

The state bears the burden of establishing, by clear and convincing evidence, that a "defendant knowingly and intelligently waived his or her right against self-incrimination and that the statement was voluntary." *Monteiro*, 924 A.2d at 790. "This inquiry 'requires an analysis of the totality of the circumstances

surrounding the interrogation.'" *State v. Bojang*, 83 A.3d 526, 533 (R.I. 2014) (quoting *Jimenez*, 33 A.3d at 734).

"A voluntary statement is a product of free will and rational choice, whereas a statement is deemed involuntary when the defendant's will [i]s overcome by coercion, threats, violence, or undue influence." *Bojang*, 83 A.3d at 533 (quoting *Monteiro*, 924 A.2d at 790). "A determination of voluntariness must be made on the basis of all facts and circumstances, including the behavior of the defendant and the behavior of the interrogators, and the ultimate test is whether the defendant's statements were the product of his free and rational choice * * * or the result of coercion that had overcome the defendant's will at the time he confessed." *Briggs*, 756 A.2d at 738 (quoting *State v. Griffith*, 612 A.2d 21, 25 (R.I. 1992)). The law concerning the issue of coercion, threats, or undue influence is well settled; for a statement to be suppressed, the defendant's free will and rational choice must have been overborne.

It is equally clear that "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)). A finding of compulsion should be based on a carefully scrutinized record that considers the evidence in the record

and the totality of the circumstances.  Because the trial justice concluded that the officers "adhered to the dictates of *Miranda*," *see id*., we look for objective facts, as set forth in the record, demonstrating that the statement "I stabbed David" was coerced or compelled, in violation of the Fifth and Fourteenth Amendments.  The record before us is devoid of any evidence that Det. DiGregorio's statement overcame defendant's free will and rational choice, nor did the trial justice find otherwise.

In order for an officer's direct or implied promise to have any bearing on whether an accused's post-*Miranda* statement was involuntary, the confession must have been obtained *as a result of that promise*—namely, there must be a causal nexus between the promise made and the involuntary statement. *Cf. State v. Leuthavone*, 640 A.2d 515, 518-19 (R.I. 1994) (considering, for purpose of a finding of voluntariness, that the defendant presented no evidence that the officer "manipulated him in any way"); *see Griffith*, 612 A.2d at 25 (considering that the police statements "did not contribute to make defendant's confession coerced"); *see also State v. Pacheco*, 481 A.2d 1009, 1025-26 (R.I. 1984) (discussing *Miranda*'s effect on confessions induced by promises and considering that "a promise, standing alone, was insufficient to render the confession involuntary").

In support of his conclusion that the statement, "I stabbed David" was involuntarily compelled, the trial justice looked to the statement of the officer and not its effect, if any, on the accused. He stated:

> "[T]his [c]ourt is *troubled* by the promise Detective * * * DiGregorio made to the defendant earlier in the day * * *: 'You're not going to [be] charged with this as long as you provide correct and accurate information.' * * * [D]irect promises are forbidden and render a subsequent statement involuntary." (Emphasis added.)

We note at the outset that defendant offered no testimony that Det. DiGregorio's statement pressured or compelled him to confess. The statement was made at the start of the audio-recorded second statement, in advance of the vehicle trip and hours before defendant admitted that he stabbed David. Despite being "troubled" by Det. DiGregorio's so-called "promise," the trial justice made no findings that this statement overcame Morillo's will, caused Morillo to confess, or influenced him in any way. There simply is no evidence in the record before us that Det. DiGregorio's statement manipulated Morillo's decision to admit to stabbing David. The defendant offered no evidence to support this finding. Indeed, Morillo testified that the officers "were insinuating that the truth [would]

be my best option" while acknowledging that he was not truthful and that he lied to the detectives when he disclosed that Rogers tossed the knives from the vehicle.[10]

The trial justice's conclusion that "direct promises are forbidden and render a subsequent statement involuntary" is incorrect. The trial justice erroneously cited this Court's holdings in *State v. Marini*, 638 A.2d 507 (R.I. 1994), and *State v. Hall*, 940 A.2d 645 (R.I. 2008), as "illustrative of factual situations where promises made a statement involuntary." The trial justice misconstrued the holdings in these cases which served as the basis for finding that the third statement was involuntary. In *Marini,* and again in *Hall,* this Court held that statements made after assurances or promises to the accused were nonetheless voluntary and admissible.

In *Marini*, this Court determined that, based upon the totality of the circumstances, officers' promises of "help" to an accused in exchange for a confession did not cause the accused to make a statement against his will. *Marini*, 638 A.2d at 513. "It is well-established that admonitions by the police to tell the truth do not render a subsequent confession involuntary." *Id.* We also recognized that law enforcement officers may tell an accused that his or her cooperation may be helpful. *Id.* This Court reaffirmed these principles in *Hall*, where an officer

_____

[10] The defendant also admitted that he lied to Det. Fortier during the initial telephone call when he told her he was at work, when in fact he was in a hotel in Seekonk, Massachusetts, with a co-defendant.

advised the defendant of his rights and then stated that if he was cooperative and truthful, the officer would advise the prosecutor and judge of the defendant's cooperation. *Hall*, 940 A.2d at 651. The defendant provided a recorded statement that was later transcribed for the jury. *Id.* Before this Court, the defendant argued that his statement was involuntary because the officer advised him that if he cooperated and gave a true statement, he would advise the prosecutor and trial judge. *Id.* at 656. We held, based on the totality of the circumstances, that the officer's statement encouraging truthfulness and cooperation did not constitute a promise or unlawful inducement "that could bend a man's will, causing him to wrongly confess." *Id.* The facts in *Hall* are quite similar to the case at bar. To the extent that the trial justice's finding that defendant's statement was involuntary rests upon what he characterized as a "forbidden" promise, we deem this clear error. We turn to the issue of whether the defendant's statement "I stabbed David" was knowing, intelligent, and voluntary.

**B**

**Knowing and Intelligent Waiver**

In order for a waiver of one's rights to be knowing and intelligent, this Court has determined that:

> "If a suspect has been advised of *Miranda* rights and thereby comprehends that there is a right to counsel and a right to remain silent and that any statements made may be used against the suspect in subsequent criminal

proceedings, the suspect—for purposes of the Constitution—has been made fully aware of the nature of his or her rights and the possible consequences of abandoning those rights. In such a case any subsequent waiver of those rights would be found to be knowing and intelligent." *Leuthavone*, 640 A.2d at 520 (emphasis omitted).

Importantly, even "[i]f, after being apprised of the *Miranda* warnings, a suspect 'nonetheless *lacks a full and complete appreciation of all* [*of*] *the consequences flowing from a waiver, it does not defeat a showing that the information * * * provided to him satisfied the constitutional minimum.*'" *Id.* (emphasis added) (brackets omitted) (quoting *Patterson v. Illinois*, 487 U.S. 285, 294 (1988)).

Although the trial justice found that Det. DiGregorio was present in the detective's vehicle and did in fact advise Morillo of the rights required by *Miranda*—contrary to Morillo's testimony that he had no memory that Det. DiGregorio was in the vehicle or that he administered the rights—the trial justice, nonetheless, found that defendant's statement "I stabbed David" was not a knowing and intelligent waiver of his rights. The trial justice found:

> "[T]his [c]ourt *is troubled* by the manner of administration of these rights. This [c]ourt finds that the manner in which defendant was given his rights was *surprisingly casual*." (Emphasis added.)

The trial justice faulted Det. DiGregorio because he "told the defendant his rights 'as a whole,' and then asked if he understood them[]" but he "did not explain each right individually[.]" The trial justice also faulted this procedure because "there

- 25 -

was no audio or video recording of the administration of these rights, nor was there an attempt to immediately access the proper equipment or forms to do so." He also found "[t]here were no rights forms in the car, nor was there an attempt to have them promptly brought to the scene." The trial justice failed to cite to any authority to support the existence of such requirements, nor are we aware of any such mandate to that effect.

The trial justice also declared that his task was to consider these facts "in light of defendant's background, experience, conduct, as well as level of education." He went on to find that "[t]he totality of these facts and circumstances leads this [c]ourt to believe that the defendant did not knowingly, intelligently, and voluntarily waive his rights." He concluded that *"[n]o person* with the education, or limited education and limited experience with law enforcement, * * * who was casually given their rights in the back of a moving police vehicle, surrounded by three detectives, after hours of questioning, *could have* reasonably believed that he had a right to silence." (Emphasis added.)

Our review of the record discloses no testimony that defendant's level of education, limited experience with law enforcement, or his presence in the police vehicle, prevented him from comprehending his rights. This finding also overlooks the undisputed fact that he consistently stated that he did comprehend his rights.

The trial justice also declared the following:

> "Further, this [c]ourt finds it *highly unusual* that the defendant who did not make any incriminating statements all afternoon during continuous questioning decided to admit his guilt * * * *almost immediately* after being administered his *Miranda* warnings[.] * * * While it is factually possible that this happened, the [c]ourt finds it *peculiar*, and, if anything, actually is evidence that demonstrates that the defendant did not truly understand or comprehend the rights that were being provided to him[.]" (Emphasis added.)

In our opinion, the trial justice did not properly perform his fact-finding function in concluding that Morillo's admission was not knowingly and intelligently made. The trial justice failed to make findings of fact and conclusions of law to support his conclusions. He stated that he was "troubled" and of the belief that Morillo's admission was "highly unusual" and "peculiar," without resolving the conflicting evidence before him and failed to make credibility determinations that supported his conclusion that defendant did not comprehend his rights while in the police vehicle.

Bearing in mind that there was no testimony from defendant about *Miranda* warnings in the police vehicle, the trial justice's *ad hoc* statements of belief, without more, do not satisfy his role as a factfinder and are not sufficient to support a conclusion that Morillo's waiver of rights was not knowing or intelligent. Moreover, the trial justice viewed Morillo's admission of guilt, "almost immediately after being administered his *Miranda* warnings * * * [as] *evidence*

that demonstrates that the defendant did not truly understand or comprehend the rights[.]" (Emphasis added.) Simply put, the trial justice drew an inference that defendant did not "truly understand or comprehend" his rights based on the timing of his admission, while overlooking the clear testimony of both detectives that the statement was not made "almost immediately" after the *Miranda* warnings. We are of the opinion that this is not a reasonable inference based on the evidence and lacks a factual foundation.

First, the trial justice overlooked the gap in time between the reading of the *Miranda* rights at 5:10 p.m., in Providence, and when Morillo admitted that he stabbed David, which was after the vehicle arrived at Main Avenue in Warwick and after Det. DiGregorio and Sgt. Robillard embarked on yet another futile hunt for evidence.[11] There was, at a minimum, a ten- to fifteen-minute span between the reading of the *Miranda* rights in Providence and the arrival in Warwick—a calculation that does not account for Det. Fortier's conversation with Morillo that led to his admission. Also, in response to the trial justice's own examination of Det. Fortier, she unequivocally responded, "[i]t wasn't within minutes." There was

---

[11] Detective DiGregorio not only testified to advising Morillo of his rights at 5:10 p.m., while still in Providence, Det. DiGregorio also stated in the fourth audio-video recorded statement that: "* * * I read you your rights at 5:10 p.m. when I realized that I felt that you were lying to us and that you had more involvement than what you were saying. Do you agree with that?" Morillo answered, "Yeah."

no evidence to the contrary. The trial justice ignored this colloquy and failed to address this testimony.

Apart from the issue of timing, the trial justice ignored the testimony from both detectives that Morillo acknowledged that he understood his rights and that he re-confirmed his understanding several times, including the audio-video recorded fourth statement. The trial justice failed to set forth his reasoning as to why the officers were not entitled to rely on defendant's numerous assurances that he understood his rights. The trial justice also failed to pass on the credibility of these witnesses, including defendant, who testified that he had no memory of Det. DiGregorio giving him *Miranda* warnings in the police vehicle, despite his video recorded acknowledgment that he understood those rights.

As noted, the trial justice engaged in a lengthy colloquy with Det. Fortier, at the conclusion of her testimony as the state's first witness. The trial justice expressed his opinion that defendant may have been "feeling pressure, like he was in a jam" when he "blurts out" that he "stabbed one of the individuals in that house." He also expressed concern about what defendant was thinking, "in his mind when he is being questioned by police officers."

> "[TRIAL JUSTICE]: So -- would it be fair to infer that he may have *heard* the *Miranda* words spoken to him but didn't understand? Why would he have fear or be feeling anxiety if he knew he could be 100 percent quiet, not say another word, and have a lawyer? Why would he feel that

way if he understood those *Miranda* warnings that the officer turned around from the front seat and read to him?

"[DET. FORTIER]: I believe that every single time he was given information of, like, what had transpired, he'd always say, 'Okay. I'm going to tell you the truth.' 'I want to tell you the truth.' I think within him he wanted to tell the truth.

"[TRIAL JUSTICE]: Okay.

"[DET. FORTIER]: And it wasn't until the end when the two other detectives got out of the vehicle where -- I don't know if he felt something heavy. But I can only describe his demeanor and the way he looked was something heavy was on him.

"[TRIAL JUSTICE]: Okay.

"[DET. FORTIER]: And he stated to me that he stabbed David.

"So, at that point, I was shocked. I didn't expect him to tell me that. Um, I saw his demeanor change. I thought it would be something different. But I was shocked.

"And I could have continued questioning him at that point because his *Miranda* rights were given. But I opted to stop. Because at that point I knew there would be a preservation of evidence that would be better if it was under recording."

"[TRIAL JUSTICE]: Okay." (Emphasis added.)

The trial justice failed to address this colloquy.

As discussed *infra*, the *Miranda* warnings administered in the vehicle and the admissibility of the third statement ("I stabbed David") have no bearing on the use of the fourth statement by the state at trial. However, should the state elect to

- 30 -

pursue the admissibility of the third statement, appropriate factual findings are required. In that event, the trial justice shall, based on the existing record, make factual findings and conclusions of law concerning whether defendant made a knowing, intelligent, and voluntary waiver of his rights in the police vehicle, including findings concerning the timing of the third statement, the credibility of the witnesses, including defendant, and shall set forth the evidence upon which he relies in making these findings. However, should the state decide to proceed to trial without resort to the third statement, no further factfinding is necessary. The third statement shall be excluded. Neither circumstance shall have any bearing on the admissibility of the fourth statement.

## The *Seibert* Effect

We now turn to the fourth statement. The state argues that the trial justice's reliance on *Seibert* was erroneous because there was no evidence of a question-first, *Mirandize*-later interrogation tactic by the detectives, particularly because Morillo made his admission *after* Det. DiGregorio advised him of his rights. *See Seibert*, 542 U.S. 600. We agree.

We note at the outset that the trial justice declared that, but for his finding that the third statement was not a knowing, intelligent, and voluntary waiver of defendant's right to remain silent, the fourth statement would be admissible:

> "[S]tanding alone, the defendant's confession during this
> fourth period of questioning would be admissible. The

audio and video recording establishes that the defendant was presented with a rights form, guided through it by the detectives, he voluntarily signed the form, and he placed his initials next to each right on the form."

The Supreme Court's pronouncements in *Seibert* and *Oregon v. Elstad*, 470 U.S. 298 (1985), upon which the trial justice rested his decision suppressing the fourth statement, have no bearing on the facts of this case because the custodial statements were made *after* the requirements of *Miranda* were met. *See Seibert*, 542 U.S. at 604, 616; *see also Elstad*, 470 U.S. at 314-15. Because *Elstad* and *Seibert* concerned the admissibility of custodial statements obtained *in the absence* of *Miranda* warnings, their holdings are unrelated to the circumstances of this case. *See Seibert*, 542 U.S. at 604, 616 (condemning a police tactic to intentionally withhold *Miranda* and first produce a confession, leaving "little, if anything, of incriminating potential left unsaid"); *see also Elstad*, 470 U.S. at 314-15 (assessing the effect of an initial unwarned statement on a second statement given after *Miranda*). Importantly, neither *Elstad* nor *Seibert*, nor their progeny, concerned whether a suspect's statement was knowing and voluntary when *Miranda* warnings had been administered before the first statement.

In *Seibert*, the United States Supreme Court was confronted with an established police protocol, designed to deliberately withhold *Miranda* warnings, interrogate a suspect until a confession was obtained, then administer *Miranda*

warnings, and "cover the same ground a second time." *Seibert*, 542 U.S. at 604. The Supreme Court held this practice rendered the *Miranda* warnings ineffective and the later statement inadmissible. *See id.* at 604, 617.

*Elstad* also concerned an incriminating statement by the accused without the benefit of *Miranda*, but, in contrast to *Seibert*, the officer's failure to advise the defendant of his rights in *Elstad* was considered an oversight and not a police practice. *Elstad*, 470 U.S. at 315-16. In *Elstad*, after being advised of *Miranda* warnings, which were "undeniably complete[,]" the issue became "whether, in fact, the second statement was also voluntarily made." *Id.* at 314, 318. There being "no question that[,] [in the second statement, the defendant] knowingly and voluntarily waived his right to remain silent before he described his participation in the [crime,]" the second statement did not violate the defendant's Fifth Amendment right against the use of compelled testimony. *Id.* at 315, 318.

In contrasting the facts of *Seibert* with those of *Elstad*, the Supreme Court set forth several factors relevant to whether a midstream recitation of warnings could be effective in accomplishing their objective, which was to "reasonably convey to a suspect his rights as required by *Miranda*." *Seibert*, 542 U.S. at 611, 615 (brackets omitted) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989)). These factors include:

> "the completeness and detail of the questions and answers in the first round of interrogation, the

overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615.

In the case at bar, the first incriminating statement consisted of three words. All further questioning ceased; defendant was arrested and transported to police headquarters in a separate vehicle. There was a change of setting between the third and fourth statements; and more than a thirty-minute break between the statements. Additionally, Morillo acknowledged at the hearing that "the information in the videotaped interview * * * is different from the other interviews[.]"

We are of the opinion that the circumstances leading to Morillo's confession are not governed by the holdings in *Seibert* or *Elstad*. In this case, the trial justice found that Det. DiGregorio administered *Miranda* warnings to the defendant while in the police vehicle, in Providence. Therefore, there was neither an unwarned statement, as in *Elstad*, 470 U.S. at 314, nor a deliberate question-first warn-later investigative tactic that was designed to produce a full confession, leaving "little, if anything, of incriminating potential * * * unsaid[,]" as in *Seibert*, 542 U.S. at 604, 616. Thus, *Seibert* and *Elstad* are wholly inapplicable, and the trial justice's reliance on *Seibert* to order suppression of the fourth statement was clearly erroneous. Accordingly, we vacate that portion of the order that suppressed the fourth statement.

**Conclusion**

For the reasons set forth in this opinion, we vacate the order of the Superior Court and hold that the fourth statement is admissible in evidence. However, should the state elect to pursue the admissibility of the third statement, "I stabbed David[,]" further factfinding, within sixty days of the date of this opinion, on the basis of the existing record, is required on the issue of whether this admission was a knowing, intelligent, and voluntary waiver of the defendant's Fifth Amendment rights. Therefore, we remand this case to the Superior Court for further factfinding or trial in accordance with this opinion. The papers may be remanded to the Superior Court.

**Justice Long, with whom Justice Lynch Prata joins, concurring.** We agree with the majority's holding with respect to both *Seibert* and the need to remand this matter for additional factfinding regarding Mr. Morillo's failure to waive his *Miranda* rights. However, our reading of the record reveals a more nuanced view of the events of March 29, 2016, as well as the testimony elicited from Detectives Fortier and DiGregorio, and Mr. Morillo, during the three-day suppression hearing in the trial court. We believe this more nuanced view of the testimony is significant for two reasons. First, Mr. Morillo has not been tried and

convicted of the four charges in the indictment. It is imperative that this Court not characterize the evidence in the record in a way that potentially prejudices his right to a fair trial. Second, our view of the record leads to a different evaluation of the state's assignments of error concerning the third statement. Therefore, we draw distinctions in our analysis of the third statement with respect to both custody and waiver.

In discussing the events of March 29, the majority opinion highlights that Mr. Morillo's narrative varied over the course of the afternoon and evening when he spoke with Dets. Fortier and DiGregorio. However, the majority opinion does not acknowledge the problematic, confusing, and conflicting testimony of the detectives themselves. Moreover, although the majority opinion discloses Mr. Morillo's testimony about his incriminating statement in a footnote, it does not describe the context of the statement as he did in his testimony. Additionally, the majority opinion recounts Dets. Fortier and DiGregorio's testimony about their perception of Mr. Morillo, but it does not relate Mr. Morillo's testimony about how he perceived their interactions.

From our review of the testimony of Dets. Fortier and DiGregorio, it appears that their preparation for the hearing was problematic. For example, Det. Fortier testified that she took notes during the events in question, which served as the basis of her report narrative. However, she admitted that her notes of the interviews no

longer existed at the time of the hearing and further conceded that she may have forgotten additional information contained in the notes. Moreover, Det. DiGregorio testified that he took no notes of his own, but relied on Det. Fortier's report narrative in preparing for the hearing.

In addition to relying on Det. Fortier's report narrative, Det. DiGregorio impermissibly communicated with Det. Fortier during the suppression hearing. On his second day of testimony, Det. DiGregorio explained that Det. Fortier escorted Mr. Morillo to the interview room at about 6:00 p.m. on March 29. However, this deviated from his previous testimony. Regarding this inconsistency, Det. DiGregorio acknowledged that he spoke to Det. Fortier about a lapse in time between Mr. Morillo's arrival at the police station and the beginning of Mr. Morillo's final interview; he also admitted that he knew it was impermissible to communicate with others about his testimony. Detective Fortier also acknowledged having spoken to Det. DiGregorio in violation of the trial court's sequestration order.

Our review of the transcripts also reveals not insignificant conflicts in the detectives' testimony. For example, Det. Fortier described the group making one stop, for fifteen to twenty minutes, on the right side of the Airport Connector to search for knives near a marsh in the vicinity of the Welcome Beautiful Rhode Island sign. However, Det. DiGregorio testified that the group stopped at a

"number of locations" on the Airport Connector. Additionally, Det. Fortier testified that, once Mirandized, Mr. Morillo said that he understood that it seemed as though he was obstructing, at which point he said that he might have discarded a single knife near Main Avenue. By contrast, Det. DiGregorio testified that, upon being Mirandized, Mr. Morillo told the detectives that he had discarded two knives at that location. Finally, Det. Fortier provided conflicting testimony regarding Mr. Morillo's arrival at the Warwick Police Department before his final interview. She initially testified that it was "[n]ot possible" for her to have communicated with him between leaving Main Avenue and when he arrived in the interview room for the fourth interview. However, after reviewing video footage on the final morning of Det. DiGregorio's testimony, Det. Fortier conceded that she in fact had walked Mr. Morillo upstairs and directed him into the interview room.

We also wish to highlight confusing testimony by the detectives regarding Mr. Morillo's third statement. Both detectives testified that Mr. Morillo might have repeated the incriminating statement to Det. DiGregorio after saying it to Det. Fortier alone. However, Det. DiGregorio further testified that he could not recall whether he heard Mr. Morillo's admission from Det. Fortier or from Mr. Morillo directly. This equivocation, in addition to the problematic and conflicting testimony previously described, contributes to our nuanced view of the testimony elicited from the detectives during the three-day suppression hearing.

- 39 -

Additionally, our view of Mr. Morillo's divergent testimony differs from that of our colleagues. Mr. Morillo testified that he did not remember being read his *Miranda* rights in the vehicle, and he provided a conflicting account of the events leading up to the third statement. Specifically, Mr. Morillo testified that, during the drive, Det. Fortier was "kind of consoling, telling [him] that [he] was going to be okay[,]" and that they just needed to find the items that Mr. Rogers had discarded. However, once they were unable to locate any knives near the Airport Connector, or the cell phone near Providence Place Mall, Det. Fortier's demeanor changed. Mr. Morillo stated that she became "a little more aggressive" and was no longer consoling or "telling [him] that [he] was going to be okay[.]" He explained that she stated that his friends were being interrogated and that the detectives would find out what happened. Mr. Morillo testified that she told him that he was not being truthful, and that he was obstructing the investigation. She further stated that she knew what happened and did not believe what Mr. Morillo had said. Mr. Morillo recounted that Det. Fortier received a phone call during the drive and then began "basically running down renditions of what * * * they th[ought] happened." Detective Fortier explained to Mr. Morillo that the detectives believed Mr. Morillo and his friends went to Mr. Rogers's house and "that they know that [he] stabbed David Rogers."

Then, while the vehicle was parked on Main Avenue, Det. Fortier received another phone call. After the call ended, Det. Fortier told Mr. Morillo that she thought he was hiding something and not telling the truth. She also stated that he would be returning to the police station in a marked police car. She told Mr. Morillo: "You stabbed David Rogers. I know you did." To which Mr. Morillo responded, "I stabbed him."

Mr. Morillo also testified about his interaction with the detectives while at the police station. Specifically, Mr. Morillo testified that when the detectives asked him questions, he "felt like [he] had to answer them" because "[he] was going to be arrested anyways." Further, Mr. Morillo explained that he changed his story to the detectives because he "felt as though when they were telling [him] to tell the truth, they meant what information they were giving [him]." Mr. Morillo also testified that he thought if he did not comply, he would be arrested and charged.

After hearing all of the testimony about the events of March 29, the trial justice remarked on the lack of clarity regarding the interactions between Mr. Morillo and the detectives. Specifically, the trial justice characterized Mr. Morillo's meetings with the police as "confusing" and sought clarification from the attorneys during their argument on the motion to suppress.

Our similarly equivocal view of the testimony shapes our approach to the state's assignments of error related to the custody and waiver rulings.

When this Court reviews a decision regarding a motion to suppress a confession, we conduct "a two-step analysis." *State v. Musterd*, 56 A.3d 931, 938 (R.I. 2012) (quoting *State v. Barros*, 24 A.3d 1158, 1179 (R.I. 2011)). We first review the trial court's findings of fact with deference. *See State v. Munir*, 209 A.3d 545, 550 (R.I. 2019). We then apply the historical facts and review *de novo* any "mixed questions of law and fact involving constitutional issues," *State v. Jimenez*, 33 A.3d 724, 732 (R.I. 2011), including whether and when a defendant is in custody, *see State v. Corcoran*, 274 A.3d 808, 813 (R.I. 2022), as well as whether a waiver of rights is valid. *Jimenez*, 33 A.3d at 734.

Given this standard of review, the trial justice's failure to resolve conflicting testimony or to make credibility determinations complicates this Court's review of the errors specified in the instant appeal. The absence of clarity regarding what the trial justice found happened during the car ride, how he made sense of the "confusing series of meetings between the defendant and the Warwick Police Department," and whom he believed, stymies this Court in conducting a *de novo* review of when Mr. Morillo was in custody and whether his waiver was knowing, intelligent, and voluntary.

However, because neither party disputes that Mr. Morillo was in custody prior to the crucial incriminating statement, we do not believe it is necessary to address the merits of the state's assignment of error on this issue. More specifically, we do not believe that this Court should offer a statement in support of the state's contention that custody commenced at any particular moment. Our prior caselaw counsels against discussing the merits of a claim when our discussion would amount to nothing more than dicta. *See Tempest v. State*, 141 A.3d 677, 687 n.15 (R.I. 2016) ("'[T]he cardinal principle of judicial restraint' is that 'if it is not necessary to decide more, it is necessary not to decide more[.]'") (quoting *PDK Laboratories, Inc. v. United States Drug Enforcement Administration*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J. concurring in part and concurring in judgment)).

By contrast, the equivocal state of the record presents a greater obstacle for this Court's analysis of whether the state met its burden of establishing that Mr. Morillo's incriminating statement was a knowing, intelligent, and voluntary waiver of his constitutional rights.

Once an accused has received *Miranda* warnings, their incriminating statement "is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *North*

- 43 -

*Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *see also Miranda v. Arizona*, 384 U.S. 436, 475 (1966). The state must meet its burden by clear and convincing evidence. *See State v. Monteiro*, 924 A.2d 784, 790 (R.I. 2007). A waiver of one's right against self-incrimination need not be an express waiver for the resulting statement to be admissible at trial. *Berghuis*, 560 U.S. at 384. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id*.

Courts may find an individual's waiver to be both knowing and intelligent if the prosecution demonstrates that "a suspect has 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon.'" *United States v. Carpentino*, 948 F.3d 10, 26 (1st Cir. 2020) (quoting *United States v. Sweeney*, 887 F.3d 529, 535-36 (1st Cir. 2018)). In order to find voluntariness, courts must first determine that the suspect's waiver was the product of both "a free and deliberate choice." *United States v. Simpkins*, 978 F.3d 1, 11 (1st Cir. 2020) (quoting *United States v. Rang*, 919 F.3d 113, 118 (1st Cir. 2019)).

While *Berghuis* and its progeny articulate a dichotomy between a suspect waiving their rights knowingly and intelligently, and whether their ultimate confession is voluntary under *Miranda*, courts must nevertheless consider the totality of the circumstances surrounding the interrogation for both inquiries. *See*

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.") (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)); *see also State v. Amado*, 424 A.2d 1057, 1062 (R.I. 1981) ("A review of all the 'attendant circumstances' is as important to a consideration of the voluntariness of a confession as it is to the determination of whether a knowing and intelligent waiver was made.").

The assessment of the totality of the circumstances may include consideration of "both the characteristics of the accused and the details of the interrogation[.]" *United States v. Rojas-Tapia*, 446 F.3d 1, 7 (1st Cir. 2006) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Thus, when analyzing whether a waiver was knowing and intelligent, courts look to whether the totality of the circumstances demonstrates that the accused understood that they had the right to counsel and the right to remain silent, and that the accused's statements could be used against them in subsequent criminal proceedings. *E.g.*, *State v. Leuthavone*, 640 A.2d 515, 520 (R.I. 1994) (analyzing when a waiver becomes knowing and intelligent under the totality of circumstances); *see also Colorado v. Spring*, 479 U.S. 564, 574 (1987) ("The *Miranda* warnings protect [the Fifth Amendment] privilege by ensuring that a suspect knows that he may

choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time."). Similarly, when evaluating voluntariness, courts view the totality of the circumstances to determine whether the defendant's "will has been overborne and his capacity for self-determination critically impaired[.]" *Schneckloth*, 412 U.S. at 225-26 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *see also State v. Hall*, 940 A.2d 645, 656 (R.I. 2008).[1]

Additionally, for purposes of this Court's review of a decision concerning a motion to suppress an incriminating statement, the trial court's "[d]etermination of what happened requires assessments of the relative credibility of witnesses whose stories, * * *, are frequently, if indeed not almost invariably, contradictory. *That*

---

[1] Promises and inducements on the part of law enforcement are among the factors that courts may consider in reviewing the totality of the circumstances. *See Arizona v. Fulminante*, 499 U.S. 279, 285-87 (1991); *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011).

We do not agree with the following statement in the majority opinion: "In order for an officer's direct or implied promise to have *any bearing* on whether an accused's post-*Miranda* statement was involuntary, the confession must have been obtained *as a result of that promise*—namely, there must be a causal nexus between the promise made and the involuntary statement." (Slip op. at 21) (additional emphasis supplied). In making the statement, the majority cites and compares *Leuthavone*, *Griffith*, and *Pacheco* as analogous to and supportive of this assertion. However, we do not believe that those cases can be reasonably read as a basis for a requirement that departs from Rhode Island and federal law on this subject. Each case involves promises that were found not to be coercive, and none discuss, mention, or imply the need for a causal nexus between the promise and an incriminating statement. *Cf. Amado*, 424 A.2d at 1063 (examining a promise found to be coercive and explaining that subtle pressures and improper influences, when considered as a whole, may deprive a defendant of the right to knowingly and voluntarily waive their constitutional rights).

*ascertainment belongs to the trier of facts before whom those witnesses actually appear*[.]" *State v. Humphrey*, 715 A.2d 1265, 1273 (R.I. 1998) (quoting *Culombe*, 376 U.S. at 603) (emphasis added). Here, after reciting testimony heard at the suppression hearing, the trial justice made some findings of fact regarding the events and circumstances of March 29, 2016. However, the trial justice did not rule on key factual and credibility determinations required for this Court to conduct its *de novo* review of the conclusions drawn from the historical facts relating to the "totality of the circumstances surrounding the interrogation." *Jimenez*, 33 A.3d at 732, 734 (quoting *Fare*, 442 U.S. at 725).

Critically, on the issue of whether Mr. Morillo knowingly waived his right to silence, the trial justice noted, but failed to resolve, conflicting testimony by the detectives and Mr. Morillo that spoke directly to the issue. For example, the trial justice acknowledged the testimony by Det. DiGregorio that, when asked whether he understood his rights, Mr. Morillo stated that he did. The trial justice also acknowledged Mr. Morillo's inconsistent testimony that he did not recall being read his rights in the car at all. Although the trial justice recognized the inconsistencies in testimony given by both detectives and Mr. Morillo, he did not make credibility determinations concerning their testimony or indicate the basis for finding that Mr. Morillo did not comprehend his rights while in the police vehicle.

The trial justice's decision similarly included broad statements of belief related to the voluntariness of Mr. Morillo's confession, but failed to provide sufficient findings of fact and credibility determinations to resolve key questions related to the totality of the circumstances.

In the absence of clear findings of fact, and considering the equivocal state of the testimony in this case, we submit that we cannot infer key factual issues related to Mr. Morillo's knowledge and understanding of his *Miranda* rights at the time Det. DiGregorio read them to him. Quite simply, this Court cannot gauge what testimony, if any, the trial justice found to be clear and convincing. Because of this Court's "longstanding reluctance to engage in factfinding or to make credibility determinations in the first instance[,]" "the appropriate procedure in this circumstance is to remand the case to the Superior Court so that the trial justice can make the appropriate findings of fact and conclusions of law." *State v. Bojang*, 83 A.3d 526, 535, 536 (R.I. 2014).

For these reasons, we concur with the majority's opinion remanding the trial justice's decision to suppress the third statement for further findings of fact.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Josue Morillo. |
| **Case Number** | No. 2020-4-C.A. (K1/16-369C) |
| **Date Opinion Filed** | December 16, 2022 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For State: <br><br> Christopher R. Bush <br> Department of Attorney General <br> For Defendant: <br><br> Michael S. Pezzullo, Esq. |